Robert Howard RICHARDSON,
Petitioner,

v.

A.C. NEWLAND, et al., Respondents.

No. CIV.S–97–2318WBS DAD P.

United States District Court,
E.D. California.

Nov. 4, 2004.

Saor Eire Stetler, Thomson and Stetler, Berkeley, CA, for Petitioner.

John Adrian Gordnier, California Attorney General's Office, San Francisco, CA, for Respondents.

## AMENDED ORDER

SHUBB, District Judge.

Petitioner, a state prisoner proceeding with counsel, has filed this application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

On September 13, 2004, the magistrate judge filed findings and recommendations herein which were served on all parties and which contained notice to all parties that any objections to the findings and recommendations were to be filed within twenty days. Respondents have filed ob- jections to the findings and recommendations. Respondents have also filed a motion seeking an order directing that the writ will be granted only in the event that retrial of the case or a stay pending appeal does not occur within a reasonable time. Petitioner's counsel has no opposition to the latter request.

In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72–304, this court has conducted a *de novo* review of this case. Having carefully reviewed the entire file, the court finds the findings and recommendations to be supported by the record and by proper analysis.

Accordingly, IT IS HEREBY OR- DERED that:

1. The findings and recommendations filed September 13, 2004, are adopted in full; and

2. Petitioner's application for a writ of habeas corpus is granted on his claim that the Confrontation Clause was violated by the admission into evidence, at the joint trial, of Michelle Garduno's extrajudicial statements and in the denial of his motion for a severance unless the state grants petitioner a new trial within 120 days from the date of this order or a stay pending appeal is issued;

3. Petitioner's application for a writ of habeas corpus is denied in all other re- spects; and

4. The Clerk of Court is directed to serve a copy of this order and the October 26, 2004 order on the parties, the Califor- nia Department of Corrections, and the penal institution where petitioner is cur- rently housed.

## FINDINGS & RECOMMENDATIONS

DROZD, United States Magistrate Judge.

Petitioner is a state prisoner proceeding pro se with an application for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 1992 conviction of first degree murder involving the personal use of a firearm. He claims that: (1) the trial court erred in denying his motion to change venue; (2) the trial court erred in failing to sever his trial from that of his co-defendant; (3) the trial court erred in admitting his co-defendant's extrajudicial statements into evidence; (4) the trial court erred in denying his motion to suppress his confession; (5) his trial counsel rendered ineffective assistance; (6) his trial counsel had a conflict of interest; and (7) cumulative error requires reversal of his conviction. After a careful review of the entire record in this action, including the lodged records of the state court, this court has determined that the petition for habeas corpus should be granted on petitioner's Confrontation Clause and severance claims and denied in all other respects.

## FACTUAL BACKGROUND [1]

Defendant made the following confession to police officers. On December 21, 1991, he awakened about 3 a.m. after four hours of sleep to go to the bathroom. He had quarreled with his wife, Linda Richardson, on the evening before about his desire for a divorce. He had decided "that it was, you know, me or her." He got up and went to the bathroom. While there "I just told myself to do it." He then walked to the spare room, grabbed a loaded pistol, returned to the bedroom and shot his wife once in the temple. As he was getting the gun he thought about where to shoot her so that she would not suffer. He knew that it was not "the right thing to do" but "it was just so quick that I didn't think to stop before I did it." The whole

thing "mighta taken 5 to 10 minutes." "I don't believe I was mad. I just felt like it was the only thing I could do. I felt like it was what I had to do." He suggested that he was motivated in part by the victim's remark that she would kill him before she gave him a divorce. However, he admitted that he did not think "she had the nerve for it."

Defendant told the police that after the killing he decided the best thing to do was to move the body. He dragged her out to the jeep and drove from his home near Portola to Stockton where he left the jeep and the body in the Macy's parking lot. He telephoned Michelle Garduno, a good friend, the young lady whose telephone call the evening before had precipitated the argument. She picked him up in her car and he informed her of the killing. He then spent the day with her as she was babysitting for a friend. That evening she gave him a ride home.

Garduno also made an out-of-court statement to the investigating officers. She related that after she picked defendant up at Macy's he gave her an account of the killing after which, in the evening, she and a friend drove him to his home. Defendant was charged with murder and Garduno as an accessory. Garduno was found not guilty by verdict of the jury.

The day before trial in an informal conference the defendant indicated a desire to make an in limine motion. The exact nature of the motion is obscure since the conference was not of record; inferably it pertained to the statement given by Garduno to the police. When the matter came on for trial on July 14, 1992,

1. The statement of facts is taken from the October 26, 1993 opinion of the California Court of Appeal for the Third Appellate District (hereinafter Opinion), included in the record as Exhibit 9 to Respondents' Answer, filed February 24, 1998. These facts are fairly supported by the record.

the prosecutor spoke first, asserting that the motion "in effect, raises the issue of the separate trials under Aranda."[2] The prosecutor argued that the court had correctly decided that issue when it denied an earlier motion for severance by the co-defendant Michelle Garduno. The prosecutor argued that under *People v. Keenan* (1988) 46 Cal.3d 478, 250 Cal.Rptr. 550, 758 P.2d 1081, raised by defendant, the issue was antagonistic defenses, but there was no antagonism between the defenses of defendant and Garduno.

The defendant argued that there was such antagonism because of Garduno's assertion in her statement to the police that before the killing defendant said he would "get rid of" his wife. The prosecutor asserted that "the Aranda–Bruton Rule deals with the fact pattern and a fact situation which is dramatically different than the one before this Court." He asserted that no *Aranda* problem existed because both defendants had confessed. He also asserted that the statement of Garduno would be admissible against defendant under hearsay exceptions even if there were a separate trial. The defendant disputed this assertion, citing, inter alia *Cruz v. New York* (1987), 481 U.S. 186 [107 S.Ct. 1714, 95 L.Ed.2d 162]. The court denied the motion in limine.

The next day on July 15, 1992, during jury selection, defendant made a motion to sever, again in an unreported chambers session. The matter was continued until the next morning. Again, the prosecutor argued first. He claimed that severance was unnecessary because the statements of the defendants would be cross-admissible in separate trials under hearsay exceptions. Defendant again complained of the prospect of admission of Garduno's statement concerning his pre-offense statements about getting rid of his wife. He argued that no hearsay exception applied.

The trial court decided that without redaction the statement of Garduno would not be admissible against defendant. It directed deletion of references to defendant's pre-offense statements and indicated the motion for severance would be denied. The defendant then moved to exclude his confession on the ground that it was involuntary and a violation of the right against self-incrimination. The prosecutor replied that the exclusion motion was untimely. The court denied the motion to suppress the confession and the motion to sever.

The prosecution commenced its case, adducing evidence as follows. Police officers located the body in the jeep in the Macy's parking lot with a contact gunshot wound to the right side of the temple. Linda Richardson's sister, Marcella Webb, went to defendant's house shortly before 9 p.m. on December 21, 1991. She had a key and let herself in. Webb had been unsuccessful in her attempts earlier that day to reach her sister. She looked in the back bedroom to see if there were any clues to her sister's whereabouts. She saw a bloodstain about three inches in diameter on the mattress, it had soaked through to the bottom. Webb went home.

Shortly after Webb arrived home defendant telephoned her and inquired if she knew where his wife was. She told him she did not and he said he would come to her house. He arrived and after a brief discussion she told him she was calling the sheriff. Deputy Sheriff Dwight Cline came to her house and spoke with them. Webb told Cline about the bloodstain out of defendant's presence. Cline left. Webb asked de-

---

**2.** *People v. Aranda* (1965) 63 Cal.2d 518, 47 Cal.Rptr. 353, 407 P.2d 265.

fendant if he had done anything to her sister. He tearfully denied the accusation. When defendant left Webb's home she called Cline and informed him.

Cline went to defendant's house and when defendant arrived Cline told him that he needed more information for the missing persons report. Defendant invited him into the house. Cline asked if anything was missing from the house. Defendant invited him to accompany defendant in looking to see if anything was missing. Cline noticed that the mattress was missing. Defendant said he had taken it to Reno to be repaired. Cline saw various firearms in another bedroom and an empty leather holster. He also saw a single set of tire prints in the snow leading up to the deck in the backyard adjacent to the family room. He saw what appeared to be two bloodstains on the family room carpet.

Detective Michael Gamberg came to defendant's house and met Cline. After talking with Cline, Gamberg spoke to defendant. Because of inconsistencies in defendant's statements Gamberg gave defendant a *Miranda [v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] admonition. Defendant stated that he understood his rights and was willing to talk to the officers. In further questioning defendant told the officers what had happened to his wife. Defendant told Gamberg the murder weapon was in the spare bedroom under a leather apron. Gamberg went there and found a .22 caliber revolver. They took defendant to the sheriff's office where he made a videotaped statement.

At this point the prosecution offered the videotape and a typewritten transcript into evidence; they were admitted without objection. The videotape of defendant's confession was played for the jury. Gamberg was examined and cross-examined on the interrogation of the defendant. He testified without ob-

jection that he was informed the autopsy showed ligature marks on the victim's neck and that when asked about this defendant told Sergeant Rives where the rope was.

Detective Steven Hitch interviewed Garduno in Stockton on December 22, 1991. When the prosecution commenced an offer of a transcript of this interview defendant objected, "on the same basis that we argued at length before the beginning of the trial." The trial court overruled the objection.

After Hitch was examined defendant asked for a bench conference. His counsel said that he wanted to put on the record a situation on page 26 of the Garduno transcript with respect to the rope underneath the bed. Counsel said the statement was inconsistent with defendant's statement on the videotape. The prosecutor said that it was not inconsistent, and that in any event it was fully consistent with another statement that defendant had made to Detective Sergeant Rives in the Plumas County Jail. Defendant's counsel disputed that latter assertion because in his view it was unclear whether defendant had conceded in answering Rives that he had the rope under the bed or only that he had used it to strangle his wife. The prosecutor suggested that Rives could be questioned on this point and defendant's counsel said that would solve the problem.

The jury was then read a stipulation that the cause of the victim's death was a gunshot wound to the right temple and that there was evidence of a ligature on the neck which, in the opinion of the pathologist did not contribute to her death.

Sergeant Larry Rives testified that when he was informed about the ligature marks he went to the jail and spoke to

the defendant. Rives made the following statement to defendant: Okay, then the other thing [Garduno said] is, that she says you also strangled your wife with a piece of rope that was underneath the bed. I talked to the people doing the autopsy, they are doing it today, and they said that there are—or there is a quarter-inch ligature mark, a bruise on the neck." Rives asked defendant if he did that. Defendant replied that he did and in response to a further question told Rives where the rope was located. Rives was cross-examined on his view of the meaning of defendant's reply.

Thereafter defendant objected to a reading of the redacted transcript of the interview of Garduno. He objected that so doing would violate his right to cross-examination and adopted the earlier arguments. The trial court overruled the objection. The transcript was read, including the following snippet:

"[Police Officer]: And she's still breathing?"

"[Garduno]: Yeah"

"[Police Officer]: So I guess he goes somewhere, and he came back with the rope, or is the rope in his bedroom?"

"[Garduno]: No. He said he had it under the bed."

## PROCEDURAL BACKGROUND

On March 13, 1992, an information was filed in the Plumas County Superior Court charging petitioner with one count of murder, in violation of California Penal Code § 187. (Answer, Ex. 1(CT) at 11–12.)[3] It was also alleged that petitioner personally used a firearm in the commission of the crime, within the meaning of California Penal Code § 12022.5. (*Id.*) In count II of the information, co-defendant Michelle

Garduno was charged with being an accessory after the fact, in violation of California Penal Code § 32. (*Id.*)

Jury trial commenced on July 14, 1992. (Answer, Exs. 2, 3, 4, and 5(RT) at 1.) On July 29, 1992, the jury found petitioner guilty of first degree murder with the personal use of a firearm. (*Id.* at 1134.) Michelle Garduno was acquitted. (CT at 187.) On August 31, 1992, petitioner was sentenced to twenty-five years to life for the murder and a consecutive five year term for the personal use enhancement. (RT at 1148–49; CT at 257–58.)

On direct appeal, petitioner argued that "the trial court prejudicially erred in failing to sever his trial from that of a co-defendant, in refusing to require that all jurors be questioned in isolation, in failing to grant a change of venue, in denying a hearing on the admissibility of his confession, and in admitting evidence of the co-defendant's out-of-court admissions." (Answer, Ex. 9 at 1.) Petitioner's conviction was affirmed in all respects by order of the California Court of Appeal for the Third Appellate District dated October 21, 1993. (*Id.* at 2.) Petitioner's petition for rehearing was denied by the California Court of Appeal on November 16, 1993. (Answer, Ex. 10.) On January 19, 1994, the California Supreme Court summarily denied petitioner's petition for review. (Answer, Ex. 11.) On December 13, 1996, petitioner filed a petition for writ of habeas corpus in the Plumas County Superior Court. (Answer, Ex. 12.) Therein, he claimed that his trial counsel rendered ineffective assistance and had a conflict of interest. (*Id.*) That petition was denied in a reasoned opinion dated May 5, 1997. (Answer, Ex. 13.) On May 23, 1997, petitioner filed a petition for writ of habeas corpus, contain-

---

3. The page numbers on Exhibit 1 to respondents' answer are difficult to read and sometimes illegible or missing. The undersigned has attempted to extrapolate the page numbers from the numbers that are legible.

ing the same claims, in the California Court of Appeal. (Answer, Ex. 14; "Petitioner's Petition for Writ of Habeas Corpus," filed by resp't on October 25, 2001.) That petition was summarily denied on June 5, 1997. (Answer, Ex. 14; "Court's Ruling of June 5, 1997," filed by resp't on October 25, 2001.) On June 26, 1997, petitioner filed a petition for writ of habeas corpus, containing the same claims, in the California Supreme Court. (Answer, Ex. 15.) That petition was summarily denied by order dated November 25, 1997. (*Id.*)

Petitioner filed a pro se petition for writ of habeas corpus in this court on December 12, 1997.[4] On February 24, 1998, respondents filed an answer to the petition and on March 23, 1998, petitioner filed a traverse. By order dated December 22, 1998, petitioner's amended motion to substitute Saor Stetler and James Thomson as counsel of record was granted. On June 11, 1999, petitioner filed an amended petition for writ of habeas corpus. By order dated July 31, 2000, petitioner's motion for equitable tolling of the statute of limitations was granted and respondents' motion to dismiss the amended petition was denied. On October 31, 2000, respondents filed an answer to the amended petition for writ of habeas corpus. On January 3, 2001, petitioner filed a traverse.

## ANALYSIS

I. *Standards of Review Applicable to Habeas Corpus Claims*

██ A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. *See Peltier v. Wright,* 15 F.3d 860, 861 (9th Cir.1994); *Middleton v. Cupp,* 768 F.2d 1083, 1085 (9th Cir.1985) (citing *Engle v. Isaac,* 456 U.S. 107, 119, 102 S.Ct. 1558, 71 L.Ed.2d

783 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Park v. California,* 202 F.3d 1146, 1149 (9th Cir.2000); *Middleton,* 768 F.2d at 1085.

██ However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." *Hines v. Enomoto,* 658 F.2d 667, 673 (9th Cir. 1981) (citing *Quigg v. Crist,* 616 F.2d 1107 (9th Cir.1980)). *See also Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941); *Henry v. Kernan,* 197 F.3d 1021, 1031 (9th Cir.1999), *cert. denied,* 528 U.S. 1198, 120 S.Ct. 1262, 146 L.Ed.2d 117 (2000). In order to raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice." *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962). *See also Henry,* 197 F.3d at 1031; *Crisafi v. Oliver,* 396 F.2d 293, 294–95 (9th Cir.1968). Habeas corpus cannot be utilized to try state issues *de novo. Milton v. Wainwright,* 407 U.S. 371, 377, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972).

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are applicable. *See Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Calderon v. United States Dist. Ct.,* 128 F.3d 1283, 1287 (9th Cir.1997). Section 2254(d) as amended by the AEDPA, sets forth the

---

4. *See Valerio v. Boise Cascade Corp.,* 80 F.R.D. 626, 635 n. 1 (N.D.Cal.1978) (judicial notice may be taken of court records), *aff'd,* 645

F.2d 699 (9th Cir.), *cert. denied,* 454 U.S. 1126, 102 S.Ct. 976, 71 L.Ed.2d 113 (1981).

following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). *See also Penry v. Johnson*, 532 U.S. 782, 792–93, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir.2001).

### II. *State Court Decisions*

As discussed above, the California Court of Appeal rejected the claims contained in petitioner's direct appeal in a reasoned opinion dated October 21, 1993. Petitioner's petition for review was summarily denied by the California Supreme Court. In this circumstance, the court must "look through" the unexplained California Supreme Court decision to the last reasoned decision, the state appellate court's decision, as the basis for the state courts'

judgment with respect to the claims contained in the direct appeal. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir.2000).

■ Petitioner's claims of ineffective assistance of counsel and counsel's alleged conflict of interest were raised for the first time on collateral review. The Plumas County Superior Court denied petitioner's claims in a reasoned opinion dated May 5, 1997. Petitioner's subsequent habeas petitions to the California Court of Appeals and California Supreme Court were summarily denied. Again, in this circumstance, this court will "look through" these unexplained decisions to the last reasoned decision, the state superior court's decision, as the basis for the state courts' judgment with respect to petitioner's ineffective assistance of counsel claims.[5]

### III. *Motion for Change of Venue*

Petitioner's first claim in the petition before this court is that the trial court erred in denying his motions for a change of venue. Citing *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), petitioner contends that he was denied a fair trial because the media coverage surrounding the trial prejudiced the jurors against him.[6] He argues that the trial should have been held in another county "where the jury pool would not have had the same exposure to the facts surrounding the case and the parties involved." (Am. Pet. at 30.)

---

**5.** Where the state courts have not provided a reasoned opinion in support of their decision on a petitioner's claims, a federal habeas court must independently review the record to determine whether the state court clearly erred in its application of federal law. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir.2000). Here, the opinions of the California Court of Appeal on direct appeal and the Plumas County Superior Court on collateral review provide the rationale for the state courts' decisions.

**6.** In *Sheppard*, the United States Supreme Court concluded that the circumstances under which that trial was held were such that inherent prejudice to the jury should be presumed. The situation confronting the court in *Sheppard* involved "not only a background of extremely inflammatory publicity but also a courthouse given over to accommodate the public appetite for carnival." *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

## A. *Facts*

The record reflects that petitioner and co-defendant Michele Garduno filed a joint motion to change venue several months before trial. (CT at 42–68.) They argued that they could not receive a fair trial in Plumas County because of the "extensive, inflammatory and prejudicial" pretrial publicity concerning the case. (*Id.* at 43.) The motion was accompanied by copies of three radio news broadcasts on three separate days, a radio news broadcast on the day of petitioner's preliminary hearing, a sheriff's department news release, four newspaper articles, a thank you letter to the community from the victim's family published in the newspaper, and the victim's obituary. (*Id.* at 46–57.) The trial court denied the motion for a change of venue without prejudice. (*Id.* at 76.) During jury voir dire, defense counsel twice renewed the motion for change of venue. (RT at 106–112; 397–99.) The court denied the motions without prejudice to their renewal at the end of voir dire. (*Id.* at 112, 399.) After voir dire was completed and petitioner had exhausted all of the peremptory challenges available to him, petitioner again renewed the motion for change of venue. (*Id.* at 561–62.) Petitioner's counsel also requested additional peremptory challenges because of his belief that there were still people on the jury who had been prejudiced by the "publicity" and the "conversations in the community." (*Id.* at 562.) These defense motions were also denied. (*Id.* at 564.)

The California Court of Appeal rejected petitioner's argument in this regard because it concluded, after a review of the whole record, "that the jury was not influenced by any of the pretrial publicity and that it is not reasonably likely that the defendant was deprived of a fair and impartial trial by reason thereof." (Opinion at 16.) The court examined the "five factors" relevant under California law in determining whether a change of venue motion should be granted: the gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim. *See People v. Jennings,* 53 Cal.3d 334, 359–60, 279 Cal.Rptr. 780, 807 P.2d 1009 (1991). The state appellate court found that: (1) the crime was "unspectacular;" (2) the pretrial publicity was "neither extensive nor inflammatory;" and (3) although seven of petitioner's jurors had read something about the case prior to trial and two others had heard something about it by word of mouth, they "disclaimed detailed recollection of the media accounts and asserted an ability to judge the matter based on the evidence." (Opinion at 16–18.) While the court also concluded that the small size and provincial nature of the community weighed on the side of a change of venue and that the status of petitioner and the victim in the community was a "neutral" factor, it ultimately determined that petitioner had received a fair trial. (*Id.*)

## B. *Law*

■ The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). *See also Green v. White,* 232 F.3d 671, 676 (9th Cir.2000). If prejudicial pretrial publicity makes it impossible to obtain an impartial jury, then the trial judge must grant the defendant's motion for a change of venue. *Gallego v. McDaniel,* 124 F.3d 1065, 1070 (9th Cir.1997); *Harris v. Pulley,* 885 F.2d 1354, 1361 (9th Cir.1988). However, jurors are not required to be totally ignorant of the facts and issues involved in a case. *Irvin,* 366 U.S. at 722, 81 S.Ct. 1639; *see also Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975);

*United States v. Sherwood,* 98 F.3d 402, 410 (9th Cir.1996). It is sufficient if the jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court. *Holt v. United States,* 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); *United States v. Dischner,* 974 F.2d 1502, 1525 (9th Cir.1992) (issue is whether jurors could impartially judge the defendant, not whether they remembered the case), *overruled on other grounds by United States v. Morales,* 108 F.3d 1031, 1035 n. 1 (9th Cir.1997).

The Ninth Circuit Court of Appeals employs a two-pronged test to determine if a petitioner's rights to due process and a fair and impartial jury have been violated by excessive and unfair publicity. *Gallego,* 124 F.3d at 1070; *Harris,* 885 F.2d at 1361; *Hart v. Stagner,* 935 F.2d 1007, 1014 (9th Cir.1991). Specifically, a petitioner must show that either prejudice should be presumed or that actual prejudice existed. *Turner v. Calderon,* 281 F.3d 851, 865 (9th Cir.2002); *Hart,* 935 F.2d at 1014 (citing *Murphy,* 421 U.S. at 800, 95 S.Ct. 2031). Prejudice may be presumed if the record demonstrates the trial venue was saturated with prejudicial and inflammatory publicity about the crime; however, prejudice is presumed only in extreme circumstances. *Gallego,* 124 F.3d at 1070; *United States v. Croft,* 124 F.3d 1109, 1115 (9th Cir.1997). *See also Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (prejudice presumed where the case involved the televising of an in-jail twenty minute interrogation of the defendant by the police in which the defendant confessed to the murder for which he was subsequently convicted); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (prejudice presumed where the press was allowed to sit within the bar of the court and to overrun it with television equipment); *Sheppard,* 384 U.S. at 357, 362, 86 S.Ct. 1507 (prejudice presumed where media accounts contained inflamma-

tory, prejudicial information that was not admissible at trial). Actual prejudice, on the other hand, exists if the jurors demonstrated actual partiality or hostility. *See Irvin,* 366 U.S. at 728, 81 S.Ct. 1639 (actual prejudice found where eight of the twelve empaneled jurors had already formed the opinion that the defendant was guilty, and 268 of the 430 potential jurors were excused for cause because they indicated some degree of belief in the defendant's guilt). Actual prejudice may also be found where the degree of adverse pretrial publicity has created a community-wide sentiment against the defendant, such that the jurors' claims that they can be impartial should not be believed. *Id.; Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).

The duty of a federal court reviewing such a claim in a habeas corpus proceeding is to "make an independent review of the record to determine whether there was such a degree of prejudice against the petitioner that a fair trial was impossible." *Harris,* 885 F.2d at 1360 (quoting *Bashor v. Risley,* 730 F.2d 1228, 1234 (9th Cir.1984)). To this end, a "reviewing court must independently examine the news reports for volume, content and timing." *Harris,* 885 F.2d at 1360. A court must also consider whether the jurors had such fixed opinions they could not impartially judge the guilt of the defendant. *Patton,* 467 U.S. at 1035, 104 S.Ct. 2885.

### C. *Analysis*

The murder in this case occurred in Plumas County, with a population of approximately 20,000 residents. (CT at 54.) Three panels of prospective jurors, totaling 160 persons, were questioned. (RT at 504.) The Feather River Bulletin, the Portola Reporter, the Chester Progressive, the Quincy Bulletin, the Indian Valley Record, the Greenville Record, and

the Sacramento Bee ran articles about the case. (*Id.* at 135, 275, 358, 593, 600, 602.) Some of these stories were identical, differing only in the masthead. (*Id.* at 135, 570, 769.) Petitioner was arrested on December 22, 1991. On that same date, the Plumas County Sheriff's Department issued a news release about the arrest. On December 23, 27, and 31, 1991, the local radio station issued reports about the story, which aired no more than three times on those dates. (CT at 45–46.) On December 31, 1991, the Feather River Bulletin (and, presumably, the other local papers mentioned during jury voir dire) ran a story on the arrest. (*Id.* at 51–53.) The Sacramento Bee also ran a news story on the case. (*Id.* at 54.) On March 13, 1992, the local radio station covered the preliminary hearing. (*Id.* at 49.) The local news coverage included: (1) information that the victim had been shot in the head and then transported to Stockton; (2) the fact that petitioner was the suspect in the murder; (3) details about the victim and her job as a preschool teacher's aide; (4) the fact that the District Attorney was considering whether to seek the death penalty; (5) information that petitioner's girlfriend had been charged with being an accessory and that petitioner had told her about the crime; (6) information that petitioner had confessed to the crime; and (7) the fact that the California Attorney General's Office was going to prosecute the case instead of the Plumas County District Attorney's Office. The Sacramento Bee reported further details of the crime, including that petitioner had confessed to killing his wife, that he had "pondered" prior to killing his wife and that he strangled the victim when she did not die immediately. (*Id.* at 54.) The Feather River Bulletin included a picture of petitioner in an orange jumpsuit and shackles. (*Id.* at 51–52.)

This court accepts petitioner's assertion that there was substantial media coverage of his case. However, after reviewing the state court record, the undersigned agrees with the California Court of Appeal's conclusion that the nature of the news coverage was primarily factual and not unduly inflammatory. Further, most of the media coverage took place at least six months before jury selection in the case commenced. Television coverage was minimal. After reading the newspaper articles and other material submitted by the petitioner, this court concludes that the record does not reflect a "general atmosphere in the community or courtroom [which was] sufficiently inflammatory and prejudicial to deny [petitioner his] right to a fair and impartial jury at trial." *See Harris*, 885 F.2d at 1363 (quoting *Murphy*, 421 U.S. at 802, 95 S.Ct. 2031). Therefore, prejudice cannot be presumed.

This court also agrees with the conclusion of the California Court of Appeal that there was no actual prejudice on the part of the jurors at petitioner's trial. While there was extensive information about the case in the local media, the coverage was not nearly so prejudicial as that found in *Irvin*, which involved a "barrage of newspaper headlines, articles, cartoons and pictures ... unleashed against ... [the defendant] during the six or seven months preceding his trial." 366 U.S. at 725–26, 81 S.Ct. 1639. Further, here, although the potential jury pool learned from media reports that petitioner had admitted to the killing, the identity of the killer was never at issue at petitioner's trial. Rather, the sole issue was whether the murder was of the first or second degree. The only coverage relevant to that issue was found in the Sacramento Bee, not a local newspaper, in which the newspaper article informed the readers that petitioner had "pondered" before killing his wife. (*See* CT at 54.) However, as explained below, that information did not unduly influence the jury pool.

During voir dire, the jurors were questioned individually regarding their exposure to media accounts of the case. For example, juror Carpenter denied having heard about the case prior to coming to court and stated that there was nothing that might make it difficult for him to judge the case fairly and impartially (RT at 477); juror Zunino had heard very little about the case and only from "word of mouth," and could not think of any reason why he could not judge the case fairly and impartially (*id.* at 157–58); juror Hermo had just heard about the case from a friend and could not think of anything that would make it difficult for her to judge the case fairly and impartially (*id.* at 307, 342–43); juror Murray had read some newspaper articles about the case but had not formed an opinion as to petitioner's guilt or innocence and believed he would not be "biased or influenced" (*id.* at 134–35, 183); and juror Janney had read about the case in the newspaper but could "set that aside" and judge the case only on the evidence (*id.* at 546–48).

■ Out of the one hundred-sixty potential jurors, twenty-six were excused for cause. Even assuming that all of these jurors were excused due to concerns regarding their exposure to pretrial publicity, however, actual prejudice on the part of trial jurors would not be demonstrated. Federal courts have found no actual prejudice when a similar proportion of jurors were excused because of prejudicial publicity. *See, e.g., Murphy,* 421 U.S. at 803, 95 S.Ct. 2031 (no actual prejudice found where twenty of seventy-eight potential jurors were excused for partiality); *Jeffries v. Blodgett,* 5 F.3d 1180, 1189 (9th Cir.1993) (finding no prejudice where almost all the venire members had read

about the trial, fourteen of one hundred eighty were excused for cause or potential prejudice and all the jurors swore they could decide impartially). All of the jurors at petitioner's trial denied having fixed opinions as to petitioner's guilt which could not be changed by the evidence admitted at trial.[7] After a review of the record, the court finds that none of the jurors' remarks during voir dire indicate partiality, fixed opinion, or the inability to decide the case based solely on the evidence presented at trial.

The opinion of the California courts that petitioner's motions for change of venue were properly denied did not result in a decision that was contrary to, or an unreasonable application of, clearly established federal law. For the reasons set forth above, petitioner has failed to show that media coverage of his arrest and trial denied him the right to a fair trial in the venue in which it was conducted. Accordingly, petitioner is not entitled to relief as to this claim.

## IV. *Motion to Sever/Admission of Co-Defendant's Statements*

Petitioner claims that his rights pursuant to the Fifth, Sixth and Fourteenth Amendments were violated by the trial court's admission of a redacted version of co-defendant Michelle Garduno's statements to police and the court's refusal to sever petitioner's trial from that of Garduno. The court will address these related claims below.

### A. *Facts*

#### 1. *Motion to Sever*

The record reflects that Garduno's counsel filed a motion for separate trials on

---

7. Even if the jurors' answers during voir dire indicated differently, however, even the "existence of a[] preconceived notion as to the guilt or innocence of an accused, without

more, is [not] sufficient to rebut the presumption of a prospective juror's impartiality." *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

April 9, 1992. (CT at 23–29.) The motion was based on two arguments: (1) that it would be unduly prejudicial for Ms. Garduno to be tried with petitioner; and (2) that petitioner could give exonerating testimony on behalf of Garduno at a separate trial. (*Id.*) At the April 20, 1992 hearing on this motion, the prosecutor gave notice that he intended to introduce the statements of both petitioner and Garduno to police at the joint trial. (Ex. 21 in Support of Answer, filed October 31, 2000, at 9.) Petitioner did not join the motion to sever. (CT at 41.)

On July 14, 1992, petitioner' counsel made a motion in limine to sever his trial from Garduno's trial. (RT at 1–25.)[8] Counsel for petitioner argued that severance was required because: (1) the prosecutor intended to introduce Garduno's extrajudicial statements against petitioner; and (2) Garduno, according to her counsel, might not take the stand and, therefore, petitioner would not be able to cross-examine her about the statements. (*Id.* at 6–7, 9.) Petitioner's trial counsel argued that the statements provided "substantially incriminating evidence on the chief point in this trial, which is the degree of culpability" and that this evidence was inconsistent with what petitioner had said in his statement to the police. (*Id.* at 7–8.) Counsel also argued that Garduno and petitioner had inconsistent defenses; to wit, petitioner's position was that he acted without forethought, while Garduno's statements implied that he premeditated the killing. (*Id.* at 5–7.) Specifically, petitioner's counsel objected to Garduno's statement that petitioner told her he wanted to "get rid of" his wife. (*Id.* at 6.) In response, the prosecutor argued that Garduno's statement would be admissible against petitioner in a separate trial because it qualified as an exception to the hearsay rule under the California Evidence Code; therefore, there was no need for a severance. (*Id.* at 10–11, 13.) The prosecution attempted to distinguish *Aranda* and *Bruton* on the basis that because both petitioner and Garduno had confessed, the confession of one co-defendant was not being offered against a co-defendant who had not confessed. (*Id.* at 12.) Petitioner's counsel argued that the statements would not be admissible against petitioner in a separate trial. (*Id.* at 14–16.) After hearing argument, the trial court denied the motion to sever. (*Id.* at 25.)

Later, the issue of severance was raised again by the trial court *sua sponte.* (*Id.* at 317–18.) The judge asked the parties to distinguish between the Supreme Court decisions in *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987) and *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979). (Answer at 20, Traverse at 12.) The prosecutor discussed the decisions in several cases in which jointly tried defendants had both

---

**8.** The motion was based on the decisions in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and *People v. Aranda,* 63 Cal.2d 518, 47 Cal.Rptr. 353, 407 P.2d 265 (1965). In *Bruton,* the United States Supreme Court held that a defendant is deprived of his Sixth Amendment right of confrontation when a facially incriminating confession of a non-testifying co-defendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the co-defendant. 391 U.S. at 135, 88 S.Ct. 1620; *see also Richardson v. Marsh,* 481 U.S. 200, 207, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). In *Aranda,* the California Supreme Court held that at a joint trial, a co-defendant's extrajudicial statements inculpating another defendant must be excluded, even if the co-defendant testified at trial. *Aranda* was abrogated in part in 1982 by an amendment to the California Constitution. *See People v. Boyd,* 222 Cal.App.3d 541, 562, 271 Cal.Rptr. 738 (1990) ("Thus, to the extent *Aranda* required exclusion of inculpatory extrajudicial statements of co-defendants, even when the co-defendant testified and was available for cross-examination at trial, *Aranda* was abrogated by Proposition 8.").

confessed, as was the case at petitioner's trial. (RT at 320–34.) [9] *See Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986); *Cruz,* 481 U.S. 186, 107 S.Ct. 1714; *Parker,* 442 U.S. 62, 99 S.Ct. 2132; *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). He noted that petitioner was not challenging his confession. (RT at 321.) In an apparent attempt to counter this argument, counsel for petitioner argued that both petitioner's and Garduno's confessions were involuntary. (*Id.* at 415–18.) The court again declined to grant a severance, stating as follows:

> All right. That would be the ruling; that the Court sees the statement of Mrs. Garduno as, in effect, covering two topics; one is the physical evidence of the murder or the alleged murder, homicide; and the other pertaining to events transpiring up to the homicide, which are verbal communications back and forth.
>
> The Court does find the part regarding the circumstances of the homicide, the physical circumstances of the homicide, reliable. And the Court finds that these statements regarding the communications prior to the homicide between Mrs. Garduno and Mr. Richardson to be unreliable from the standpoint that Mrs. Garduno could have been theoretically a suspect as an accomplice, at the time she gave the statement.
>
> So the court will—so Ms. Garduno's statement in its present form would be inadmissible. And—but the Court would consider the redaction, and find it admissible with the deletion of references to the communications prior to the homicide.

(*Id.* at 458.)

The trial court then ordered that the parties agree upon a written transcript that could be submitted in lieu of editing the tape recording of Garduno's statements. (*Id.* at 458–59.) Immediately after this ruling, petitioner's counsel moved to exclude petitioner's confession from admission into evidence on the grounds that it was "taken non-voluntarily and in circumstances which make it a violation of right against self-incrimination." (*Id.* at 459.) In this regard, defense counsel argued as follows:

> The motion, your Honor, we believe becomes timely because of the Court's ruling. It substantially changes whether or not my client would take the stand, because, obviously now if he takes the stand, the information that has been redacted comes in a different fashion on rebuttal. Consequently, it changes the focus of the case. It changes the desire of the Defense to have the Defendant take the stand. And consequently, changes trial tactics to the point that the confession, which probably is not a voluntary confession, becomes a different question now from the point of view of trial tactics.

(*Id.* at 459.) The prosecutor countered that defense counsel was

> well aware, when he represented several days and several months ago, that his client would be taking the stand. That regardless whether Ms. Garduno testified or did not testify, whether her statement was admitted directly or in rebuttal, that if his client testified, that the Garduno statement could come in against him, and that it would be available for impeachment . . . .

(*Id.* at 460.) The prosecutor described the motion to suppress petitioner's confession as manipulative and "spurious." (*Id.*)

---

9. The prosecutor referred to Garduno's statements to police as a "confession," even though she did not admit to any wrongdoing. (*Id.* at 321.)

The trial court summarily denied the defense motion to exclude petitioner's confession. (*Id.*) The court subsequently accepted a redacted version of Garduno's statement to be read to the jury at petitioner's trial. (*See* Am. Pet., Ex.6.) The prosecutor represented that he would make no reference to the redacted portions. (RT at 460–61.) The redacted statement was read to the jury. (*Id.* at 878–913.) Although the redacted statement did not contain reference to petitioner's desire to "get rid of" his wife, Garduno's assertions that petitioner told her he "kept going out in the hallway and going back and forth, back and forth" before he shot the victim, and that the rope apparently used to strangle the victim was under the bed, remained. (*Id.*)

At trial Detective Gamberg testified that when he lifted the mattress in petitioner's house and looked under the bed, he saw no evidence that anything was regularly stored or kept underneath. (*Id.* at 806.) He also testified that the rope was found by police in a room along with "a lot of spare parts and motorcycles, and other things in it." (*Id.* at 814.) On cross-examination, Detective Gamberg testified that he looked under petitioner's bed because "we had learned that there was a fishing stringer that we ultimately located, that was allegedly left under the bed; and that's where that came to mind." (*Id.* at 794.) He conceded, however, that based upon the investigation at the scene there was no indication that the fishing stringer had in fact been under the bed before the murder. (*Id.*)

Petitioner testified in his own defense at trial. On cross-examination, petitioner was asked whether he had told Garduno that he thought he should "get rid of" his wife. (*Id.* at 958.) He admitted making these statements but claimed that he meant to divorce her, not to kill her. (*Id.* at 958–59.) He also denied telling Gardu-no or the police that the rope that he used to strangle his wife was under the bed. (*Id.* at 962, 966–67.)

In the petition pending before this court petitioner argues that the introduction of Garduno's redacted statement violated his Sixth Amendment rights to confront the witnesses against him and to the effective assistance of counsel, his Fifth Amendment right against self-incrimination and his Fourteenth Amendment due process rights. He argues that Garduno's statement differed from his own confession with regard to the issue of premeditation. Specifically, he points to that part of Garduno's statement wherein she stated that petitioner "kept going out in the hallway and going back and forth, back and forth" before he shot the victim, and her statement that the rope was under the bed. He notes that he did not admit pacing the hallway and that he told police that the rope was in the spare bedroom. Petitioner argues that the prosecutor "relied primarily upon Garduno's statements to convince the jury that petitioner committed first degree murder instead of second degree murder or manslaughter." (Am. Pet. at 33.)

With regard to his Fifth Amendment argument, petitioner states that when his motions for severance and to exclude his confession were denied, he was "forced to testify in his own behalf or risk the inevitable adverse inference the jury would draw from his decision not to testify." (*Id.* at 31.) He notes that the prosecution was allowed to cross-examine him regarding all of the statements he made to Garduno, including the statements that had been redacted. (Traverse at 13.) He contends, "the issue in this case is whether the introduction of an inculpating confession from a co-defendant who would not testify would violate *Bruton* and require a severance." (*Id.* at 14.) Respondents, on the other

hand, contend that petitioner's argument before the Court of Appeal was essentially that the trial judge had erred in allowing Garduno's redacted statement to be admitted into evidence. Respondents argue that the state appellate court's decision on this evidentiary question was correct and certainly not "contrary to any Supreme Court ruling." (Answer at 21.)

After addressing pertinent federal and state authorities, the California Court of Appeal concluded that the trial court did not err in denying petitioner's motions to sever. It found that Garduno's statement was "potentially admissible" at a joint trial because "the statements of defendant were within the exception for admissions of a party (Evid.Code § 1220) and those of Garduno concerning what defendant had told her were within the reach of the hearsay exception for declarations against interest (Evid.Code § 1230)." (Opinion at 11.) The state appellate court noted that at the time of the hearing on the motion to sever:

> the only significant discrepancy offered the court between Garduno's statement and defendant's confession lay in her assertion that defendant had spoken of "getting rid of" his wife on occasions before the killing. Since the trial court directed that Garduno's statement be redacted to remove this discrepancy there was no abuse of discretion under the *Bruton–Aranda* [sic] in denying the motion to sever.

(*Id.* at 12.) [10] Therefore, according to the California Court of Appeal, the "facts as they appear[ed] at the time of the hearing on the motion" justified the court's decision. (*Id.*)

### 2. *Admission of Garduno's Statement*

In a related argument, petitioner contends that Garduno's statements to police should not have been admitted at trial because they constituted inadmissible hearsay, thereby violating his right to confrontation, cross-examination and due process. In rejecting these arguments, the California Court of Appeal concluded that all of Garduno's statements, except those about the location of the rope, were admissible hearsay, but that even if the rope comments were inadmissible, there was no prejudice because those statements came in by way of another witness. The court reasoned as follows:

> For the reasons given, Garduno's statements were admissible at the point of defendant's ultimate objection except for her assertion that defendant told her the rope he used to strangle his wife was under the bed. That statement arguably might be found admissible under *Lee* in light of defendant's statement to Rives. We need not examine that prospect. By the time Garduno's redacted statement was read to the jury it had already been told, in the testimony of Rives, to which no objection was made, that she had told the investigating officers that defendant said the rope was under the bed. The reiteration of that information in reading her statement, if error, was categorically harmless.

(*Id.* at 12–13.)

As discussed, the record reflects that petitioner initially objected only to the admission of that portion of Garduno's statement that referred to petitioner's stated desire to "get rid of" his wife. (RT at 416, 455.) He argued that these statements were barred by *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162

---

**10.** As discussed, petitioner now argues that additional discrepancies existed including whether petitioner paced "back and forth" before killing his wife and whether the rope was under his bed or in another bedroom.

(1987). (*Id.* at 455.) The objected-to statements were later ordered redacted. (*Id.* at 458.) Subsequently, counsel requested that the statements regarding the location of the rope also be redacted. (*Id.* at 830.) In response, the prosecution contended that Garduno's statement about the rope was consistent with the statements made by petitioner to Detective Rives; therefore, it should not be redacted. (*Id.* at 831–32.) Defense counsel then argued that petitioner's statement to Rives was ambiguous and that Rives should be available for cross-examination. (*Id.* at 832–33.) Rives was later called as a witness and cross-examined on the statement about the location of the rope. (*Id.* at 862–76.) He testified that he believed petitioner was responding in the affirmative to both parts of his question to petitioner on this subject.[11] (*Id.* at 868, 872.) Ultimately, the statements about the rope were not redacted from Garduno's statement.

Respondents contend that the admission of Garduno's comments regarding the statements about the rope was not prejudicial because defense counsel knew these statements would come into evidence through the tape recording of petitioner's interview with Detective Rives. Respondents argue that the admission of the Garduno statements did not force petitioner to testify because "it had always been petitioner's trial strategy to testify in an attempt to convince the jury that he neither premeditated nor deliberated the murder" and that petitioner had "always" intended to testify in order to prevent Garduno

from being convicted. (Answer at 24.) Finally, respondents argue that Garduno's statement was sufficiently reliable to be admissible in a joint trial even though she did not testify. (*Id.* at 24–25.)

Petitioner contends that, while he intended to testify only if necessary to exculpate Garduno from the charges against her, he ultimately was forced to testify because of the court's rulings on severance, admission of the redacted statement and the admissibility of his confession. (Traverse at 13.) He alleges that the factual dispute as to this issue entitles him to an evidentiary hearing. (*Id.*)

### B. *Law*

#### 1. *Severance*

A court may grant habeas relief based on a state court's decision to deny a motion for severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair trial. *Zafiro v. United States,* 506 U.S. 534, 538–39, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (court must decide if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence"); *United States v. Lane,* 474 U.S. 438, 446 n. 8, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) ("misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial"); *Featherstone v. Estelle,* 948 F.2d 1497,

---

11. The disputed colloquy between petitioner and Detective Rives was as follows:

> D: Ok. Then the other thing is, that she says that you also strangled your wife with a piece of rope that was underneath the bed. I talked to the people doing the autopsy. They're doing it today and they said there are—there is a quarter inch ligature mark or bruise on the neck. Did we do that?

> R: Yeah.

> \* \* \* \* \* \*

> D: What, what happened to the rope?
> R: It should be there.
> D: Do you know where you put it?
> R: Yeah, it's in that spare room there.

(Ex. 19 in Support of Answer, filed October 31, 2000, at 2.)

1503 (9th Cir.1991) (same). Petitioner bears the burden of proving that the denial of severance rendered his trial fundamentally unfair, *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir.1997), and must establish that prejudice arising from the failure to sever was so "clear, manifest, and undue" that he was denied a fair trial. *Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir. 1999) (quoting *United States v. Throckmorton*, 87 F.3d 1069, 1071–72 (9th Cir. 1996)). *See also United States v. Cruz*, 127 F.3d 791, 798 (9th Cir.1997) (moving party must demonstrate that the joint trial impinged on a fundamental trial right or compromised the fairness of the proceedings in a tangible way).

■ On habeas review, federal courts neither depend on the state law governing severance in state trials, *Grisby*, 130 F.3d at 370 (citing *Hollins v. Dep't of Corrections, State of Iowa*, 969 F.2d 606, 608 (8th Cir.1992)), nor consider procedural rights to a severance afforded to criminal defendants in the federal criminal justice system. *Id.* Rather, the relevant question is whether the state proceedings satisfied due process. *Id.; see also Cooper v. McGrath*, 314 F.Supp.2d 967, 983 (N.D.Cal.2004).

### 2. *Confrontation Clause*

■ The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI. This right, extended to the States by the Fourteenth Amendment, includes the right to cross-examine witnesses. *Cruz v. New York*, 481 U.S. 186, 189, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987) (citing *Pointer v. Texas*, 380 U.S. 400, 404,

85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)).[12] "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Lilly v. Virginia*, 527 U.S. 116, 124, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (quoting *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990)). *See also Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (a primary interest secured by the Confrontation Clause is the right of cross-examination). Nonetheless, at the time of petitioner's trial, federal law provided that an unavailable witness's out-of-court statement could be admitted against a criminal defendant and not run afoul of the Confrontation Clause so long as it bore adequate indicia of reliability— i.e., fell within a "firmly rooted hearsay exception" or otherwise bore "particularized guarantees of trustworthiness" such that adversarial testing would be expected to add little, if anything, to the statement's reliability. *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Lilly*, 527 U.S. at 124–25, 119 S.Ct. 1887. Notably, accomplice confessions that incriminated a criminal defendant were not deemed to fall within a firmly rooted exception to the hearsay rule. *Lilly*, 527 U.S. at 134, 119 S.Ct. 1887. Therefore, incriminating statements by a non-testifying co-defendant could be admitted against another defendant only if they satisfied the "particularized guarantees of trustworthiness" prong of *Roberts*. *Lilly*, 527 U.S. at 134–37, 119 S.Ct. 1887. *See also Lee v. Illinois*, 476 U.S. 530, 543, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986); *Forn v. Hornung*, 343 F.3d 990, 996–97 (9th Cir.2003).

**12.** A witness is considered to be a witness "against" a defendant for purposes of the Confrontation Clause if his testimony "is part of the body of evidence that the jury may consider in assessing his guilt." *Cruz v. New York*, 481 U.S. 186, 190, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987).

The United States Supreme Court has since held that the Confrontation Clause bars the state from introducing into evidence out-of-court statements which are testimonial in nature unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In so holding, the Supreme Court observed that: "[d]ispensing with confrontation because testimony is obviously reliable is akin to dispensing with a jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." *Id.*, 124 S.Ct. at 1371. In reaching this conclusion, the Supreme Court reviewed its prior decisions in the area and found that they had been "largely consistent" with the principles set forth in *Crawford* (*id.*, 124 S.Ct. at 1367) and "faithful" to the "original meaning of the Confrontation Clause." *Id.*, 124 S.Ct. at 1369. The court noted:

> Our cases have thus remained faithful to the Framers' understanding: Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.

*Id. See also Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Lee*, 476 U.S. at 539, 106 S.Ct. 2056 (state's attempt to admit co-defendant's confession to double murder where no right to cross-examination rejected); *Cruz*, 481 U.S. at 187–88, 107 S.Ct. 1714 (where a non-testifying co-defendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant and even if the defendant's own confession is admitted against him); *Lilly*, 527 U.S. at 139, 119 S.Ct. 1887 (admission of a non-testifying accomplice's confession violated the defendant's right to confront his accuser notwithstanding the hearsay exception for declarations against penal interest).

At the request of this court, the parties have submitted supplemental briefs addressing the applicability of the *Crawford* decision, if any, to the instant case. Respondents argue that the *Crawford* decision constitutes a "new rule" which cannot be applied to this case under the Supreme Court's decision in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Petitioner asserts that *Crawford* did not announce a "new rule" of constitutional law, but merely applied traditional Confrontation Clause principles to the facts presented in that case. Petitioner contends that because Ms. Garduno's statement was clearly testimonial and was admitted without proper adversarial testing as required by the Sixth Amendment, the decision in *Crawford* mandates the granting of habeas relief here.

▮ In *Teague* the United States Supreme Court held that new rules of criminal procedure are generally not applicable on habeas review. 489 U.S. at 301, 310, 109 S.Ct. 1060; *see also Gonzalez v. Pliler*, 341 F.3d 897, 904 (9th Cir.2003). Thus, "[w]ith few exceptions, the *Teague* non-retroactivity doctrine prohibits courts from announcing new rules of law in federal habeas proceedings." *Hoffman v. Arave*, 236 F.3d 523, 537 (9th Cir.), *cert. denied*, 534 U.S. 944, 122 S.Ct. 323, 151 L.Ed.2d 241 (2001). However, a decision announces a "new rule" only if it " 'breaks new ground or imposes a new obligation on the States or the Federal Government [or] if the result was not dictated by precedent existing at the time the defendant's conviction became final.' " *Jones v. Smith*, 231 F.3d 1227, 1236 (9th Cir.2000) (quoting *Teague*, 489 U.S. at 301, 109 S.Ct. 1060). *See also Hoffman*, 236 F.3d at 537. Thus,

" '[t]o determine what counts as a new rule, *Teague* requires courts to ask whether the rule a habeas petitioner seeks can be meaningfully distinguished from that established by binding precedent at the time his state court conviction became final.'" *Hoffman,* 236 F.3d at 537 (quoting *Wright v. West,* 505 U.S. 277, 304, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (O'Connor, J., concurring)). *See also Gonzalez,* 341 F.3d at 904.

### C. *Analysis*

■■■ As described above, habeas corpus relief in this case may not be granted unless the adjudication of petitioner's claims by the California courts (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at different result. *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (quoting *Williams,* 529 U.S. at 405–06, 120 S.Ct.

1495). Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the petitioner's case. *Williams,* 529 U S. at 413, 120 S.Ct. 1495.

In light of *Crawford,* the decision of the California Court of Appeal with respect to petitioner's claim of Confrontation Clause error is contrary to clearly established federal law as is presently exists.[13] However, for purposes of the AEDPA, this court must look to federal law as it existed at the time of the state court decision in determining whether the petition should be granted. *Williams,* 529 U.S. at 412, 120 S.Ct. 1495; *Clark v. Murphy,* 331 F.3d 1062, 1069 (9th Cir.2003). The *Crawford* case would have "existed" at the time of the decision of the California Court of Appeals on petitioner's claims only if the rule announced therein is considered an "old rule" within the meaning of *Teague. Williams,* 529 U.S. at 412, 120 S.Ct. 1495.

The question of the retroactive effect of *Crawford,* if any, has been recognized as an important one. *Horton v. Allen,* 370 F.3d 75, 83 (1st Cir.2004) ("[W]e bypass the question here because, as explained below, *Crawford* does not apply to this case."). The Ninth Circuit has declined to decide the question in a published decision as of yet. *Leavitt v. Arave,* 383 F.3d 809,

---

**13.** Respondents argue that *Crawford* is not necessarily applicable to this case because Garduno's statements to police may not have been "testimonial." The argument is unpersuasive and the court rejects it. This case clearly concerns an out-of-court statement that is "testimonial" in nature. *Crawford,* 124 S.Ct. at 1364 ("statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard"); *see also Haymon v. New York,* 332 F.Supp.2d 550, 556–58 (W.D.N.Y.2004). The Supreme Court in *Crawford* specifically declined to "spell out a comprehensive definition" of what constitutes a testimonial statement (*id.,* 124 S.Ct. at 1374), but it listed "various formulations of this core class of 'testimonial' statements.'" *Id.,* 124 S.Ct. at 1364. For instance, prior testimony at a preliminary hearing, previous trial, or grand jury proceeding, as well as responses made during police interrogations, fall within this "core class." *Id.,* 124 S.Ct. at 1364, 1374.

830 n. 22 (9th Cir.2004) ("we will doubtless be called upon to consider the retroactivity of *Crawford's* holding at some point, but we need not do so in this case."). The Eighth Circuit has expressed doubt that the doctrine announced in *Crawford* would apply retroactively in habeas corpus cases, as have several lower courts. *Evans v. Luebbers,* 371 F.3d 438, 444 (8th Cir.2004); *see also Haymon v. New York,* 332 F.Supp.2d 550, 557–58 (W.D.N.Y.2004); *Wheeler v. Dretke,* 2004 WL 1532178, *1 n. 1 (N.D.Tex. July 6, 2004). Other district courts have seemingly applied the essential holding of *Crawford* in pending habeas actions without discussion of the retroactivity issue. *See Cooper v. McGrath,* 314 F.Supp.2d at 985, 987; *Liggins v. Graves,* 2004 WL 729111, *7 (S.D.Iowa Mar.24, 2004). Those lower courts to specifically address the issue have concluded that the holding in *Crawford* is a new rule of law that cannot be retroactively applied in habeas proceedings to determine whether a state court decision is contrary to federal law. *Hutzenlaub v. Portuondo,* 325 F.Supp.2d 236, 237–38 (E.D.N.Y.2004); *Dorchy v. Jones,* 320 F.Supp.2d 564, 572–73 (E.D.Mich.2004); *Johnson v. Renico,* 314 F.Supp.2d 700, 706 (E.D.Mich.2004). Another district court has reached this same conclusion after recognizing the question to be a "close" one. *Murillo v. Frank,* 316 F.Supp.2d 744, 749 (E.D.Wis. 2004). In this regard, the court observed:

> The question is close because although *Crawford* rejected the application of *Roberts* to testimonial statements, the Court had never explicitly applied *Roberts* to such statements. As Justice Scalia noted in his opinion for the *Crawford* majority, "[o]ur cases have thus remained faithful to the Framers' understanding: Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 124 S.Ct. at 1369. Thus, it can be argued that *Crawford* did not announce a new rule at all.

*Id.* at 749, n. 4.

The undersigned concludes that the argument recognized by the district court in *Murillo,* that *Crawford* did not announce a new rule at all but rather is entirely faithful to the Supreme Court's prior decisions in this area, is the more persuasive one. A review of the decision in *Crawford* reveals that it is based on bedrock principles that "date[ ] back to Roman times." 124 S.Ct. at 1359. Although *Crawford* abrogated *Roberts* in some respects, Justice Scalia noted that the Supreme Court decisions in cases involving the admission of testimonial statements of witnesses absent from trial had "remained faithful" to the concepts articulated in the court's ruling in *Crawford. Id.,* 124 S.Ct. at 1369. In fact, the court's opinion makes clear that the Supreme Court had never applied *Roberts* to out-of-court testimonial statements. *Id.,* 124 S.Ct. at 1367–1370. In other words, *Crawford* did not articulate a change in procedure, it merely reaffirmed and clarified procedures that had long been in place.

 Applying *Crawford* to the facts of this case, it is clear that the trial court violated petitioner's Sixth Amendment right to confrontation when it admitted Garduno's testimonial hearsay statement against him at trial. *Crawford* holds that the Confrontation Clause bars the use against a defendant of statements given to the police by a witness who does not testify at trial if the defendant has not had a prior opportunity to cross-examine that witness. That is precisely what occurred here.[14] The opinion of the California

14. Petitioner was not able to cross-examine Garduno because she was his co-defendant and had properly invoked the Fifth Amend-

Court of Appeal rejecting petitioner's argument on this claim was, therefore, contrary to the holding of the United States Supreme Court in *Crawford.* Accordingly, petitioner is entitled to relief on this claim.[15]

However, whether or not the decision in *Crawford* announced a new rule that cannot be applied to this habeas action under *Teague* is not critical to the resolution of this petition. *See Dorchy,* 320 F.Supp.2d at 575 (finding that a state appellate court's determination that the petitioner's right to confrontation was not violated was contrary to and/or an unreasonable application of the Supreme Court precedents summarized by the court in *Crawford* ). Even applying federal law as it existed prior to *Crawford,* this court concludes that petitioner is entitled to relief on his Sixth Amendment claim. As explained above, prior to the decision in *Crawford,* incriminating statements by a non-testifying co-defendant were admissible against the other criminal defendant pursuant to the Confrontation Clause only if the statements satisfied the "particularized guarantees of trustworthiness" prong of *Roberts.* Guarantees of trustworthiness were drawn

from the totality of the circumstances surrounding the preparation of the statements. *Idaho v. Wright,* 497 U.S. 805, 820–21, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). "When a court can be confident— as in the context of hearsay falling within a firmly rooted exception—that 'the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility,' the Sixth Amendment's residual 'trustworthiness' test allows the admission of the declarant's statements." *Lilly,* 527 U.S. at 136, 119 S.Ct. 1887 (quoting *Wright,* 497 U.S. at 820, 110 S.Ct. 3139). Garduno's statement does not fall within a "firmly rooted" hearsay exception and therefore must bear sufficient indicia of reliability to be admissible against petitioner. *Lilly,* 527 U.S. at 134, 119 S.Ct. 1887; *Lee,* 476 U.S. at 543, 106 S.Ct. 2056 (statement made by an accomplice inculpatory of the defendant is presumptively unreliable under *Roberts*); *Forn,* 343 F.3d at 996–97 (statements admitted under declaration against penal interest hearsay exception did not have particularized guarantees of trustworthiness).

ment privilege not to testify. A witness who properly has invoked the Fifth Amendment privilege is not available for cross-examination. *California v. Green,* 399 U.S. 149, 168 n. 17, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

**15.** The United States Supreme Court has applied a harmless error test to cases involving Confrontation Clause error. *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The standard to be used is whether the admission of the improper evidence had an effect on the jury that was harmless beyond a reasonable doubt. *Id.* at 680–81, 106 S.Ct. 1431; *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Whether an error is harmless beyond a reasonable doubt depends upon factors such as (1) the importance of a witness's testimony in the prosecution's case, (2) whether the testimony was cumulative, (3) the

presence or absence of corroborating or contradictory evidence, and (4) the overall strength of the prosecution's case. *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431. In *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) the Supreme Court reversed a state murder conviction due to a Confrontation Clause error and remanded for a determination of harmless error under *Chapman.* Justice Stevens, however, doubted that an accomplice's confession implicating an accused, without the benefit of cross-examination could ever pass constitutional challenge. 527 U.S. at 137, 119 S.Ct. 1887. In light of the emphasis placed by the Supreme Court in *Crawford* on the importance of the right to confrontation to the structure of a fair trial, a finding of harmless error seems even less likely today than when the Supreme Court decided *Lilly.*

Thus, in *Lilly,* the Supreme Court found that an accomplice's confession inculpating a criminal defendant did not contain sufficient guarantees of trustworthiness, even where: (1) the confession was corroborated by other evidence, (2) the declarant had been read his *Miranda* rights, (3) the confession was against the declarant's penal interest, and (4) no evidence showed an express promise of leniency in exchange for the declarant's statement. In holding that the statement failed to contain sufficient guarantees of trustworthiness, the Court was persuaded by the fact that the witness was being questioned because of his involvement in, and knowledge of, serious crimes and had a "natural motive to attempt to exculpate himself." 527 U.S. at 139, 119 S.Ct. 1887.

Likewise in *Lee,* where the Supreme Court held that admission of a non-testifying co-defendant's confession violated the Confrontation Clause, the court explained that its holding was premised on cases recognizing "the basic understanding that when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination." 476 U.S. at 541, 106 S.Ct. 2056. This is so because "th[e] truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination.... 'Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about

what the defendant said or did are less credible than ordinary hearsay evidence.' " *Id.* (quoting *Bruton,* 391 U.S. at 141, 88 S.Ct. 1620 (White, J., dissenting)). Accordingly, the Supreme Court concluded that accomplices' confessions that incriminate defendants were "presumptively unreliable." 476 U.S. at 541, 106 S.Ct. 2056.

In light of these authorities, and under the circumstances presented by this case, Garduno's statements to police were clearly untrustworthy and unreliable and should not have been admitted into evidence at petitioner's trial.[16] In this regard, the state court record reveals that: (1) when the police came to Garduno's house to question her, she claimed that she was just preparing to go to the police department to tell them about what had occurred, but stopped because she figured the police were there for the same reason (RT at 879); (2) at that point, Garduno told the police what had happened the day before with petitioner (*id.*); (3) thereafter, Garduno repeated her story in a lengthy tape-recorded session (*id.* at 877–7913); and (4) police officers read Garduno her *Miranda* rights prior to the tape recorded statement. (*Id.* at 879.) In her statement to police Garduno claimed that her only involvement in the crime had been driving petitioner back to his house after he dropped off the victim's body. (*See id.* at 880–82, 901–02.) However, during their interrogation of Garduno police questioned her as to: whether she had an idea about what had happened even before petitioner told her (*id.* at 886, 905); whether she had telephoned petitioner before he had come to meet her (*id.* at 887); whether she had left petitioner the number where she could be reached on the day in question (*id.*); [17]

---

16. Indeed, the trial court found her statement regarding pre-homicide communications to be unreliable because she was an accomplice suspect at the time she was interrogated. (RT at 458.) Unfortunately, the trial court's parsing of the statement into pre-homicide and post-homicide communications has no legitimate basis. The entire interrogation took

place while Garduno was a suspected accomplice of petitioner. Her potential motivation remained the same.

17. At the joint trial the prosecutor later argued the significance of Garduno leaving the phone number of where she would be work-

whether she had gone inside petitioner's home after the murder (*id.* at 902); why she had not decided to tell the police what had happened until the day after she had accompanied petitioner (*id.* at 904);[18] and why she had agreed to take petitioner back to his house (*id.* at 913). Because it was Garduno's position that she was unaware of and innocent in connection with the underlying homicide, she would have had a tremendous incentive to clear herself of any wrongdoing, if necessary at petitioner's expense. The undersigned is not convinced that Garduno's truthfulness is so clear from the surrounding circumstances that cross-examination would have been of marginal utility. On the contrary, it would be difficult to conceive of a situation more clearly illustrating the need for cross-examination.

> As the Supreme Court has observed:
>
> It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old ex parte affidavit practice—that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing.

*Lilly,* 527 U.S. at 137, 119 S.Ct. 1887. *See also Lee,* 476 U.S. at 545, 106 S.Ct. 2056 ("As we have consistently recognized, a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another."); *Murillo,* 316 F.Supp.2d at 752 (recognizing that while the Supreme Court has indicated that the presumption of unreliability could conceivably be rebutted, the Court's prior Confrontation Clause decisions have suggested that it is highly unlikely in cases where one suspect accuses another in the course of a police interrogation). Here, the presumption that Garduno's statements to police minimizing her own conduct and inculpating petitioner were unreliable has not been rebutted.

 Further, the admission into evidence of Garduno's hearsay statements was so prejudicial to petitioner as to require separate trials. The critical issue at petitioner's trial was whether he had premeditated the killing. If the trial judge had granted petitioner's motion to sever his trial from Garduno's and her statements to police had been excluded from evidence at his separate trial, petitioner would not have been compelled to testify. Under those circumstances, the prosecution would have had little or no evidence of premeditation on petitioner's part. However, because the trials were held jointly, and because the trial court refused to exclude Garduno's statements to police, petitioner was, in essence forced to testify in order to rebut Garduno's statements incriminating him of a premeditated murder. In short, the decision to try petitioner and Garduno together and to admit Garduno's partially redacted statement compromised petitioner's constitutional rights and de-

---

ing with petitioner on the day in question. (RT at 1068.)

**18.** Garduno told her interrogators that she really didn't want to go to the police because she "didn't want to get in trouble." (RT at 904.) At the joint trial the prosecutor questioned whether Garduno had actually intended to go to the police, pointing out that the police confronted her at her grandmother's home. (*Id.* at 1113.) The prosecutor also argued that Garduno had gone an entire day without reporting the murder to the authorities and made that disclosure only after being confronted by police. (*Id.*)

nied him the right to a fair trial. This error had a substantial and injurious influence on petitioner's conviction. *See Ghent v. Woodford*, 279 F.3d 1121, 1127 (9th Cir. 2002) (finding prejudice from the erroneous admission of evidence having an effect on the disputed issue of petitioner's mental state, not on the undisputed question of whether petitioner actually committed the crimes); *Cooper*, 314 F.Supp.2d at 988.

 For all of these reasons, the opinion of the California Court of Appeals rejecting petitioner's challenge to his conviction based upon the admission of his co-defendant's statement and the denial of his severance motion is contrary to the United States Supreme Court's decisions in *Bruton*, *Lilly*, and *Lee* and should be set aside.[19]

### V. Petitioner's Confession

Petitioner's next claim is that the trial court erred in denying his motion to suppress his confession. He argues that the trial court's ruling violated his "due process right to have a court determine whether his confession is voluntary before it is submitted to the trial jury." (Am. Pet. at 43.)

The state court record reflects the following. Immediately after the trial court ruled that Garduno's statements to police would be admitted into evidence at the joint trial, petitioner's counsel stated: "[a]t

this point, your Honor, because of the Court's ruling, I would now move to exclude Robert Richardson's confession on the grounds that it was taken non-voluntarily and in circumstances which make it a violation of right against self-incrimination." (RT at 459.) The prosecutor argued that the motion was untimely and that petitioner's counsel had "known about this confession since he has represented Mr. Richardson." (*Id.*) Petitioner's trial counsel countered that:

> The motion, your Honor, we believe becomes timely because of the Court's ruling. It substantially changes whether or not my client would take the stand, because, obviously now if he takes the stand, the information that has been redacted comes in a different fashion on rebuttal. Consequently, it changes the focus of the case. It changes the desire of the Defense to have the Defendant take the stand. And consequently, changes trial tactics to the point that the confession, which probably is not a voluntary confession, becomes a different question now from the point of view of trial tactics.

(*Id.*)

The prosecutor responded, arguing that the confession was "clearly voluntary," and stating:

---

**19.** If the Confrontation Clause would be violated by the admission of a co-defendant's confession, at trial the court may hold separate trials, use separate juries, abandon use of the confession, or redact the confession to reduce or eliminate prejudice. *Gray v. Maryland*, 523 U.S. 185, 192, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). Here, Garduno's statement was redacted by the trial court in an effort to avoid the Confrontation Clause problem raised by petitioner's counsel. Specifically, the statement was redacted only to eliminate reference to petitioner's statement that he wanted to "get rid of" his wife. However, as noted by petitioner, he was nonetheless subjected to cross-examination regarding his statement about "get[ting] rid of" his wife, thereby nullifying the effect of the redaction. Further, there were other instances where Garduno's statement implicated petitioner in a premeditated murder; to wit, her assertions that petitioner paced the hallway prior to killing his wife and that the rope was located under petitioner's bed. In short, the redaction employed by the trial court did not eliminate the prejudice to petitioner by the trial court's decision to conduct a joint trial where testimonial statements by petitioner's co-defendant were admitted against him.

I would remind the Court that when this discussion began several days ago, that Mr. Jackson was well aware of the rules of Prop 115.

He was well aware, when he represented several days and several months ago, that his client would be taking the stand. That regardless of whether Ms. Garduno testified or did not testify, whether her statement was admitted directly or in rebuttal, that if his client testified, that the Garduno statement could come in against him, and that it would be available for impeachment under 115.

This is a spurious motion. It's made at a point in time where Mr. Jackson is now trying to manipulate, based on events that he's known since he's represented Mr. Richardson, that he's known were a possibility.

This motion doesn't change anything and the motion to exclude the confession is untimely and inappropriate.

(*Id.* at 459–60.)[20] The trial court summarily denied the motion to suppress. (*Id.* at 460.) Petitioner's confession was admitted into evidence at trial five days later without further objection at that time. (*Id.* at 775.)

Petitioner argues that the trial court's failure to conduct an evidentiary hearing to address the voluntariness of the confession and/or the "*Miranda* violation" violated his right to due process.[21] Respondents contend that petitioner's failure to make a contemporaneous objection to the use of the confession at the time it was offered into evidence constitutes a procedural bar precluding federal review of the merits of this claim. Petitioner counters that his oral in limine motion to suppress the statement constituted a contemporaneous objection under California law and that the state courts' ruling to the contrary was contrary to or an unreasonable application of federal law and was based on an unreasonable determination of the facts.

The California Court of Appeal determined that petitioner had waived his claim of error in denying the motion to suppress because of his failure to object to the admission of the confession at the point when it was offered. (Opinion at 15.) In this regard, the court stated:

> Generally, following an unfavorable ruling on an in limine motion the party seeking exclusion must object when the evidence is offered to preserve the issue for appeal. (*People v. Morris* (1991) 53 Cal.3d 152, 189[, 279 Cal.Rptr. 720, 807 P.2d 949].) However, where it appears from the record that defense counsel justifiably concluded that repetition of the same objection advanced in the motion in limine would serve no useful purpose the issue may be preserved for appeal.
>
> Here defense counsel was aware of the rule since he so objected elsewhere. Nevertheless, he made no objection to

---

**20.** Proposition 115, enacted in June 1990, added certain constitutional and statutory provisions relevant to severance and joinder of charges. (Cal. Const., art. I, § 30, subd. (a); Cal.Penal Code § 954.1). Article I, section 30, subdivision (a) of the California Constitution, as enacted by Proposition 115, now provides: "This Constitution shall not be construed by the courts to prohibit the joining of criminal cases as prescribed by the Legislature or by the people through the initiative process." Section 954.1, as adopted by Proposition 115, now provides in relevant part:

"In cases in which two or more different offenses . . . have been charged together in the same accusatory pleading, . . . evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together. . . ."

**21.** Petitioner represents that he "was never given *Miranda* warnings when first interrogated at his home and all subsequent confessions stemmed from that initial *Miranda* violation." (Traverse at 23.)

adduction of defendant's confession at the point of admission. Where defense counsel alerts the trial court to a desire to raise the issue of voluntariness shortly before the admission of evidence of a confession the trial court must make an express ruling on that issue. (See *People v. Blair* (1975) 51 Cal.App.3d 480, 485[, 124 Cal.Rptr. 123].) However, in view of the long interval between the denial of the motion in limine and the point of admission, the trial court was not required to make an express ruling on voluntariness.

In light of the whole record we deem the failure to object to the admission of the confession at the point when it was offered a waiver of any claim of error in denying the in limine motion.

(*Id.* at 14–15.) Petitioner disagrees with the state court's ruling on this issue and insists that his counsel's oral motion constituted a contemporaneous objection pursuant to the decisions in *Morris* and *Blair* cited by the state appellate court.

■ In *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the United States Supreme Court held that a defendant's inculpatory statements cannot be presented to a jury unless those statements have been found voluntary by the court. Therefore, a defendant who objects to the admission of his confession is entitled to have the issue of voluntariness determined by someone other than the convicting jury; in this case, by the trial judge. *Id.* at 391, 84 S.Ct. 1774. The remedy for a violation of *Jackson* is an evidentiary hearing in state court on the voluntariness of the confession. *Id.* at 394, 84 S.Ct. 1774. In *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the Supreme Court held that a defendant's failure to make a timely contemporaneous objection under state law to the admission of his inculpatory statements, absent a showing of cause for the

noncompliance and some showing of actual prejudice, barred habeas corpus review of his *Miranda* claim. In this case, the California Court of Appeal determined that petitioner failed to make a proper contemporaneous objection to the introduction of his confession and therefore waived this claim on appeal. (Opinion at 15.) Because the California courts are the final expositors of California law, this court must accept their conclusion that petitioner's failure to object to the admission of his confession violated California's contemporaneous objection rule. *See Wainwright*, 433 U.S. at 86, 97 S.Ct. 2497. The California Court of Appeal's ruling to that effect was not an unreasonable application of clearly established federal law as determined by the United States Supreme Court on procedural default.

■ As the United States Supreme Court has explained, in all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The Ninth Circuit has held that California's "contemporaneous objection rule" is an adequate procedural bar. *Hines v. Enomoto*, 658 F.2d 667, 673 (9th Cir.1981) (citing *Wainwright*, 433 U.S. at 87, 97 S.Ct. 2497). *See also Vansickel v. White*, 166 F.3d 953, 957–58 (9th Cir.1999); *Rich v. Calderon*, 187 F.3d 1064, 1070 (9th Cir. 1999) ("We may not review his six other prosecutorial misconduct claims because [petitioner] procedurally defaulted by failing to make contemporaneous objections,

and the California court consequently invoked a procedural bar to their consideration, the validity of which Rich has failed to overcome"), *cert. denied*, 528 U.S. 1092, 120 S.Ct. 827, 145 L.Ed.2d 696 (2000).

▪ Petitioner has not attempted to demonstrate cause for failing to contemporaneously object to the admission of his confession because he takes the position that his counsel did not fail to object. He has also failed to demonstrate actual prejudice or that a fundamental miscarriage of justice will result if this claim is barred. Thus, the claim is barred from review and relief should be denied on that basis.

Even if the state appellate court's reliance on the procedural bar was contrary to or an unreasonable application of federal law, petitioner would not be entitled to relief on this claim.[22] Petitioner claims that his confession was involuntary and improperly obtained in violation of his Fifth Amendment rights. (Am. Pet. at 44–45; Traverse at 23.) Although alleged in a very vague manner,[23] petitioner suggests that the basis for this claim is that: (1) he made statements to police prior to being advised of his *Miranda* rights even though police considered him a suspect at the time and (2) his confession was obtained by police promises that the crime he committed was only manslaughter. (Am. Pet. at 47–50.) Neither the evidence adduced at trial,[24] nor the law, provide any support for petitioner's claim.

On December 21, 1991, Plumas County Sheriff's Deputy Dwight Cline responded to a call and met with petitioner and his sister-in-law who wished to file a missing persons report regarding the victim. (RT at 713–14.) Petitioner described for Deputy Cline what the victim had been wearing when she left their residence the night before following an argument the two had. (*Id.* at 715–16.) The victim's sister, outside the presence of petitioner, told Deputy Cline that she had seen a blood stain on the mattress at petitioner's home. (*Id.* at 719.) Learning that petitioner was returning to his home, Deputy Cline went to the residence and, upon telling petitioner he needed additional information regarding the victim, was invited into the house by petitioner. (*Id.* at 720–22.) Petitioner answered questions and asked the deputy to accompany him through the house as they sought to determine if any of the victim's things had been taken. (*Id.* at 723–24.) As they went through the house Deputy Cline noticed the mattress to the

---

**22.** The Ninth Circuit has held that "[u]nder California law, an objection to evidence in the form of a motion in limine is normally sufficient to preserve the issue for appeal even in the absence of a contemporaneous objection at trial." *Thomas v. Hubbard*, 273 F.3d 1164, 1176 (9th Cir.2001), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815 (9th Cir.2002) (citing *People v. Morris*, 53 Cal.3d 152, 279 Cal.Rptr. 720, 807 P.2d 949 (1991)). Thus, the Ninth Circuit has concluded that the state may not rely on the contemporaneous objection rule as a basis for procedural default since that rule is not consistently applied where a petitioner has made a motion in limine to exclude testimony at trial. *Thomas v. Hubbard*, 273 F.3d at 1176.

**23.** Petitioner at times phrases the issue as being whether the state trial court erred in failing to conduct an evidentiary hearing in response to his counsel's oral in limine motion. An evidentiary hearing is not required in response to a boilerplate Miranda motion. *See United States v. Howell*, 231 F.3d 615, 620 (9th Cir.2000), *cert. denied*, 534 U.S. 831, 122 S.Ct. 76, 151 L.Ed.2d 40 (2001). In any event, the issue presented by petitioner is whether his constitutional rights were violated by the admission of his confession into evidence.

**24.** The investigating police officers testified at petitioner's trial regarding their investigation, including their conversations with petitioner culminating in his interrogation and confession. (RT at 712–877.) The officers were cross-examined by petitioner's trial counsel. (*Id.*)

master bed was missing, which petitioner stated he had taken to Reno for repairs, as was a handgun from a holster. (*Id.* at 726–27.) Deputy Cline also noticed that: the snow on the outdoor deck had been disturbed as if something had been dragged across it; there were tire prints in the snow leading up to the deck; and there were two red stains on the carpet in the family room. (*Id.* at 730–32.) Deputy Cline contacted Sheriff's Sergeant Larry Rives and told him what he had observed. (*Id.* at 729.) Detective Michael Gamberg was then dispatched to the scene. (*Id.*)

Upon Detective Gamberg's arrival at the residence, Deputy Cline told him what he had observed and what petitioner had told him. (*Id.* at 745.) Detective Gamberg asked petitioner if he would take him through the house and petitioner agreed. (*Id.* at 747, 754–55.) Detective Gamberg asked petitioner if he had any weapons and petitioner said he did, taking him to the room where the guns were kept. (*Id.* at 751.) There, Detective Gamberg observed the same empty holster that Deputy Cline had seen. (*Id.* at 752.) Sergeant Rives then arrived at the residence and he and Detective Gamberg asked petitioner additional questions. (*Id.* at 752–53; Am. Pet. Ex. 4.) After detecting inconsistencies in what petitioner was now telling them,[25] the officers advised petitioner of his *Miranda* rights. (RT at 753; Am. Pet. Ex. 4 at 12.) Petitioner stated that he understood his rights and would talk to the officers. (*Id.*) When confronted with the officer's observations, petitioner briefly denied any wrongdoing and then confessed to the killing of his wife. (*RT* at 758; Am. Pet., Ex 4 at 12–17.) Petitioner was then

transported to the Sheriff's Department where he gave a videotaped confession.[26] (*Id.* at 759; Am. Pet., Ex. A.) Later that day Sergeant Rives conducted another interview of petitioner that was sound recorded. (RT at 863–66.)

A review of the trial testimony and the transcripts and reports of petitioner's statements to investigating officers provides no support for his claim that his confession was involuntary or otherwise improperly obtained and that the state trial court erred in failing to suppress it.

■■■ The Fourteenth Amendment to the United States Constitution demands that confessions be made voluntarily. *See Lego v. Twomey,* 404 U.S. 477, 483–85, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Involuntary confessions may not be used to convict criminal defendants because they are inherently untrustworthy and because society shares "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano v. New York,* 360 U.S. 315, 320–21, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). A confession is voluntary only if it is " 'the product of a rational intellect and a free will.' " *Medeiros v. Shimoda,* 889 F.2d 819, 823 (9th Cir.1989) (quoting *Townsend v. Sain,* 372 U.S. 293, 307, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)). *See also Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). "The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however

25. Clothes fitting the description petitioner had given as the clothes the victim was wearing when she left the residence were seen on the bedroom floor by Detective Gamberg. (RT at 755.) The Detective also observed blood smudges on a blanket and in the hallway and family room. (*Id.* at 756–57.)

26. Petitioner has submitted transcripts of the interviews and police reports reflecting the officers' interactions with him prior to his confession. (*See* Am. Pet., Exs. 1–4.)

infused, propels or helps to propel the confession." *Collazo v. Estelle,* 940 F.2d 411, 416 (9th Cir.1991) (en banc) (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)). *See also Pollard v. Galaza,* 290 F.3d 1030, 1033 (9th Cir.) ("Under the Fourteenth Amendment, a confession is involuntary only if the police use coercive means to undermine the suspect's ability to exercise his free will."), *cert. denied,* 537 U.S. 981, 123 S.Ct. 449, 154 L.Ed.2d 343 (2002); *Henry v. Kernan,* 197 F.3d 1021, 1027 (9th Cir. 1999).

■■■ "There is no 'talismanic definition of 'voluntariness'' that is 'mechanically applicable.'" *Clark v. Murphy,* 331 F.3d 1062, 1072 (9th Cir.) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 224, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)), *cert. denied,* —— U.S. ——, 124 S.Ct. 446, 157 L.Ed.2d 313 (2003). Rather, voluntariness is to be determined in light of the totality of the circumstances. *See Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); *Beaty v. Stewart,* 303 F.3d 975, 992 (9th Cir.2002), *cert. denied,* 538 U.S. 1053, 123 S.Ct. 2073, 155 L.Ed.2d 1098 (2003); *Derrick v. Peterson,* 924 F.2d 813, 817 (9th Cir.1990). This includes consideration of both the characteristics of the petitioner and the details of the interrogation. *Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041 (The court must examine "the factual circumstances surrounding the confession, assess [ ] the psychological impact on the accused, and evaluate [ ] the legal significance of how the accused reacted."). *See also Withrow v. Williams,* 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993); *Clark,* 331 F.3d at 1072; *Henry,*

197 F.3d at 1026 ("[v]oluntariness depends on such factors as the surrounding circumstances and the combined effect of the entire course of the officers' conduct upon the defendant"). Relevant circumstances that should be considered include the following factors: (1) the youth of the accused; (2) his intelligence; (3) the lack of any advice to the accused of his constitutional rights; (4) the length of the detention; the prolonged nature of the questioning; and (5) the use of any punishment such as the deprivation of food or sleep. *Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041; *United States v. Haswood,* 350 F.3d 1024, 1027 (9th Cir.2003). In the end, the court must determine under the totality of the circumstances whether "the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Beaty,* 303 F.3d at 992 (quoting *United States v. Leon Guerrero,* 847 F.2d 1363, 1366 (9th Cir.1988)). *See also Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976); *Haynes v. Washington,* 373 U.S. 503, 513–14, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).

■■■ Of course, officials cannot extract a confession "by any sort of threats or violence, nor ... by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Hutto,* 429 U.S. at 30, 97 S.Ct. 202 (quoting *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897)).[27] Neither physical intimidation nor psychological pressure is permissible. *Haswood,* 350 F.3d at 1027; *United States v. Tingle,* 658 F.2d 1332, 1335 (9th Cir.1981). False promises or threats may also render a confession invalid. *Miranda,* 384 U.S. at

---

27. This broadly-stated rule has not been applied to invalidate, per se, all statements made by a suspect in response to a promise made by law enforcement personnel. Rather, the promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances. *See Hutto,* 429 U.S. at 30, 97 S.Ct. 202.

476, 86 S.Ct. 1602 ("any evidence that the accused was threatened, tricked, or cajoled into a waiver (of Fifth Amendment right to remain silent) will, of course, show that the defendant did not voluntarily waive his privilege"); *Henry*, 197 F.3d at 1024 (confession was coerced where interrogating officers falsely told accused that what he said could not be used against him). *But cf. United States v. Crawford*, 372 F.3d 1048, 1060–61 (9th Cir.2004) (en banc) (trickery, deceit and even impersonation does not render a confession inadmissible so long as government agents do not make threats or improper promises); *Pollard v. Galaza*, 290 F.3d 1030, 1034 (9th Cir.2002), *cert. denied*, 537 U.S. 981, 123 S.Ct. 449, 154 L.Ed.2d 343 (2002) ("misrepresentations made by law enforcement in obtaining a statement, while reprehensible, does not necessarily constitute coercive conduct").

■ There is simply no evidence that "physical or psychological coercion" or "improper inducement" led to petitioner's statements or that petitioner's will was overborne in any way. Petitioner was merely encouraged to tell the truth and was told that the officers would bring his cooperation to the attention of the court. There is nothing coercive about such conduct by investigating officers. *See Clark*, 317 F.3d at 1049 (telling a suspect that in the officer's opinion expressions of remorse weigh heavily with judges and juries was not coercive); *United States v. Coleman*, 208 F.3d 786, 791 (9th Cir.2000); *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir.1988) ("An interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect.").

■ To the extent petitioner's claim is that his confession was obtained in violation of *Miranda* it also lacks merit. "An officer's obligation to administer *Miranda* warnings attaches ... 'only where there has been such a restriction on a person's freedom as to render him "in custody." ' " *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). Whether a suspect is in custody turns on whether there is a " 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (quoting *Mathiason*, 429 U.S. at 495, 97 S.Ct. 711). This inquiry requires a court to examine the totality of the circumstances from the perspective of a reasonable person in the suspect's position. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). When one voluntarily accompanies investigating officers, even to the police station for questioning, it is an indication that the person is not in custody. *See Crawford*, 372 F.3d at 1051, 1059–60 (defendant who voluntarily went to the local FBI office to speak with agents was not in custody); *Bains v. Cambra*, 204 F.3d 964, 972–73 (9th Cir. 2000) (defendant who either voluntarily went to police station to continue questioning or failed to object thereto was not in custody), *cert. denied*, 531 U.S. 1037, 121 S.Ct. 627, 148 L.Ed.2d 536 (2000); *People of the Territory of Guam v. Palomo*, 35 F.3d 368, 375 (9th Cir.1994) (same). Whether petitioner was considered a suspect before voluntarily submitting to questioning is irrelevant to the determination of whether he was in custody at the time. *Stansbury*, 511 U.S. at 323, 114 S.Ct. 1526; *Palomo*, 35 F.3d at 375.

■ Here, petitioner and his sister-in-law filed a missing person's report regarding petitioner's wife. When officers responded to his home with respect to that report, petitioner invited them in and was cooperative. While making statements to police at his home during their preliminary investigation of the missing persons report, petitioner was clearly not in custody. Even before taking him to the police station for questioning, the investigating officers advised petitioner of his rights, which he waived. The record reveals no constitutional violation. Accordingly, even if this claim were not procedurally barred, petitioner would not be entitled to relief.

## VI. *Ineffective Assistance of Counsel*

Petitioner claims that he was denied the effective assistance of counsel because counsel "failed to adequately raise the *Miranda* and the voluntariness claims as separate grounds justifying the exclusion of petitioner's confession" and because counsel had a conflict of interest. (Am. Pet. at 45, 51.) After setting forth the applicable legal principles, these claims will be evaluated in turn below.

### A. *Legal Standards*

To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *See Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally, competent assistance. *Id.* at 690, 104 S.Ct. 2052; *Wiggins v. Smith,* 539 U.S. 510, 520–22, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003). Second, a petitioner must es-

tablish that he was prejudiced by counsel's deficient performance. *Strickland,* 466 U.S. at 693–94, 104 S.Ct. 2052. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id. See also Williams,* 529 U.S. at 391–92, 120 S.Ct. 1495; *Laboa v. Calderon,* 224 F.3d 972, 981 (9th Cir.2000).

In assessing an ineffective assistance of counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" *Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). There is in addition a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg,* 898 F.2d 695, 702 (9th Cir.1990) (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). However, that deference " 'is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments.'" *Williams v. Woodford,* 306 F.3d 665, 711 (9th Cir.2002) (quoting *Mayfield v. Woodford,* 270 F.3d 915, 927 (9th Cir.2001)(en banc)).

### B. *Petitioner's Confession*

Petitioner claims that his trial counsel rendered ineffective assistance when he failed to "adequately raise the voluntariness and *Miranda* violation as separate grounds supporting the in limine motion to exclude petitioner's confession," in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution (Am. Pet. at 45–46.) He argues that his trial counsel "failed to submit the pros-

ecution's case to meaningful adversarial testing" because he did not "challenge the admissibility of the crucial item of evidence that altered the course of the trial." (Traverse at 24.) Petitioner concedes that his counsel made a motion to suppress his confession, but contends that it was "fruitless" and "failed to raise all meritorious grounds for suppression." (*Id.* at 27.) He states that, to the extent counsel's actions and/or omissions were based on strategic and tactical decisions, the decisions were based on "actual conflicts of interest, inadequate and unreasonable investigation, and were not reasonable, rational or informed." (Am. Pet. at 46.) He contends that, but for counsel's errors, the confession would not have been admitted and petitioner would not have been found guilty of first-degree murder. (*Id.*)

Respondents argue that petitioner was not prejudiced by counsel's actions because petitioner's confession would have been placed before the jury through his own cross-examination, since he always intended to take the stand, or through the admission of his statements to Garduno. Respondents contend that "regardless of any efforts to suppress petitioner's confession there was no way trial counsel could alter the evidence available to convict his client." (Answer at 30.) Petitioner denies that he always intended to take the stand and alleges that the factual dispute over this "material" issue entitles him to an evidentiary hearing. (Traverse at 26.)

The court first notes that petitioner's trial counsel did move to suppress petitioner's confession at trial on the grounds that it "was taken non-voluntarily and in circumstances which make it a violation of right against self-incrimination." (RT at 459.) Although petitioner's counsel did not specifically use the word "*Miranda,*"

the words he did use raised a challenge based on a violation of petitioner's Fifth Amendment rights.[28] Petitioner is apparently challenging counsel's failure to make a more vigorous motion.

■ After a review of the state court record and the context in which these events occurred, this court concludes that petitioner's trial counsel did not render ineffective assistance in failing to state his motion in a more artful manner. Counsel's explanation of the basis for his suppression motion was sufficient to include both "*Miranda*" and "voluntariness" grounds. There is no evidence that the trial judge failed to grasp the full import of counsel's argument. This court concludes that trial counsel's performance with respect to his oral motion to suppress was within the wide range of professionally competent assistance.

■ To the extent that petitioner is challenging counsel's decision to wait until the trial court denied his severance motion and ruled that Garduno's statement would be admitted into evidence before challenging petitioner's confession, his claim must fail. The record reflects that counsel's trial tactics were motivated partly by a desire to ensure, as much as possible, that Garduno was acquitted of all charges against her. In light of this objective, petitioner's counsel realized that petitioner might have to take the witness stand in order to testify regarding Garduno's minimal role in the events. However, after the trial court denied his motions to sever and to exclude Garduno's statements to police, counsel's trial tactics changed out of necessity. It then became imperative that petitioner exercise his Fifth Amendment right to remain silent and attempt to keep his

**28.** As noted by petitioner, the *Miranda* decision was based on Fifth Amendment princi- ples. *See* Am. Pet. at 50.

confession from the jury. Moreover, "counsel's tactical decisions are 'virtually unchallengeable.'" *Furman v. Wood*, 190 F.3d 1002, 1007 (9th Cir.1999) (citing *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052). Ultimately, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores–Ortega*, 528 U.S. 470, 481, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000). This change of tactics by petitioner's trial counsel was reasonable under the circumstances. The decision of the California Court of Appeal that petitioner's trial counsel did not render ineffective assistance because of his failure to adequately raise "voluntariness" and *"Miranda"* grounds for suppression of petitioner's confession is not contrary to or an unreasonable application of federal law under the *Strickland* standard. Accordingly, relief as to this claim should be denied.

### C. *Conflict of Interest*

Petitioner claims that his conviction was obtained in violation of the "Fifth, Sixth and Fourteenth Amendments to the United States Constitution" because at the time of his trial petitioner's attorney was representing Detective Gamberg, a prosecution witness, in a civil lawsuit. Petitioner contends that this situation created an "actual conflict of interest." (Am. Pet. at 51.)

The record reflects that on May 6, 1991, Detective Gamberg filed a pro se civil complaint for slander against Michael Crane, the Plumas County District Attorney. (Am.Pet., Ex. 11.) The complaint alleged that Mr. Crane made defamatory remarks about Detective Gamberg during a radio interview which were allegedly "slanderous per se because they charged [Gamberg] with the crime of extortion and other unnamed violations of Federal law." (*Id.* at consecutive p. 3.) Michael Jackson, petitioner's trial attorney, was retained by Gamberg to prosecute that civil action on

June 27, 1991. (Am.Pet., Ex. 12.) Apparently, the suit was not pursued (did not proceed to judgment) "because Mr. Gamberg decided on his own not to pursue it." (Ex. 20 filed in Support of Answer, filed Oct. 31, 2000, at 2.) The date on which the suit was dismissed is not apparent from the record before this court.

Petitioner claims that his counsel was simultaneously representing two clients "whose interests were adverse to the other." (Am. Pet. at 54.) He contends:

> In Gamberg's civil action, Jackson was required to portray Gamberg as a police officer who had never been involved with misconduct related to his job … In petitioner's case, it was necessary to portray Gamberg as a "crooked cop" who coerced Mr. Richardson and violated his *Miranda* rights to secure a confession and evidence of the crime. Due to these adverse interests, there was no way that one case would not suffer detriment as a result of the other.

(*Id.*) Petitioner argues that his attorney could have used allegations of police misconduct by Gamberg as "impeachment evidence;" especially here, where "petitioner has alleged that Gamberg committed misconduct by failing to inform him of his *Miranda* rights and by inducing a confession from petitioner." (*Id.* at 56.) He speculates that this "impeachment material" was not used by counsel because of "the actual conflict between the interests of his clients." (*Id.*) He also contends that counsel did not raise a *Miranda* challenge to petitioner's confession because he did not want to jeopardize Detective Gamberg's position in the civil suit. (*Id.* at 60.)

At the preliminary hearing on March 13, 1992, after the prosecutor called Detective Gamberg to the stand, petitioner's counsel announced that he was representing Detective Gamberg in an unrelated civil law-

suit. (Am. Pet., Ex. 10 at 28.) The following exchange then took place:

THE COURT: The bigger concern that I have at this point, Mr. Jackson, have you explained this to your client, Mr. Richardson?

MR. JACKSON: Mr. Richardson are you aware that I represent Mr. Gamberg in a civil suit? And do you have any objection to me continuing to represent you?

THE DEFENDANT: No.

MR. GORDNIER (the prosecutor): May I inquire a little further than that, your Honor?

THE COURT: Yes, would you please?

MR. GORDNIER: Through the Court, if I may.

THE COURT: Let me just ask. Mr. Richardson, you understand what your attorney is saying, is that correct, sir?

THE DEFENDANT: Yes. He's representing him, yep.

THE COURT: Okay. And the concern that we have is that we want to be sure that you understand that fact, and it's your desire to continue to have Mr. Jackson represent you on this case; is that correct?

THE DEFENDANT: Yes.

THE COURT: Did you have anything further that you wanted to ask Mr. Gordnier?

MR. GORDNIER: Only that I would appreciate it if the Court would inquire of Mr. Richardson, whether he has any concern with Detective Gamberg and Mr. Jackson having had a discussion—which I have no reason to question—that relates only to matters in connection with the civil case and does he understand that there is no discussion, as represented by Counsel, in connection with the criminal matter that has occurred; in light of that, whether he's prepared to accept the—

THE COURT: I'm not certain I fully—

MR. GORDNIER: Basically, what I want the Court to do is to establish the record that he's aware that—of this there have been discussions, and that they have not related to this; and that is your understanding.

THE COURT: Did you hear that, Mr. Richardson?

(No audible response.)

THE COURT: You have to answer out loud.

THE DEFENDANT: Yes, it is.

THE COURT: Okay, thank you, sir.

MR. GORDNIER: Thank you, your Honor.

(*Id.* at 28–30.) During voir dire, but outside the presence of the jury, the issue was raised again in the following manner:

MR. JACKSON: Your Honor, I have Mr. Gambert (sic) here as well as—your Honor, if the Court remembers, I represent Michael Gamberg in a civil action. I have told Mr. Richardson that we have previously put on the record that Mr. Richardson waived any conflict in regard to my representation of Mr. Gambert (sic) in a completely other-related civil action.

But I would, for the record, like to put it back on the record because he may have changed his mind at this point.

I would also ask Mr. Gamberg to waive any potential conflict that I might have in my representation of Mr. Richardson in this case, because I do intend to be real hard on Mr. Gamberg.

WITNESS GAMBERG: I have no problem with that whatsoever, I waive anything.

MR. GORDNIER: I will indicate for the record that at his first opportunity, Counsel advised me of this; we did put it on the record before.

THE COURT: All right, Mr. Richardson?

THE DEFENDANT: I have no problem with that.

THE COURT: All right, fine. All right, thank you very much. That will be on the record.

(Am.Pet., Ex. 13.)

Petitioner claims that he did not make a "knowing and intelligent waiver in writing" of conflict-free counsel, as required by the California Rules of Professional Conduct. (Am. Pet. at 52.) He contends that there was "no meaningful attempt" to explain the ramifications of the conflict to him. (*Id.*) He states, "petitioner had no idea that he was entitled to conflict-free representation and that he would be provided with new counsel if he had not waived that substantial constitutional right." (*Id.* at 53.) Petitioner also argues that the trial court "failed to make an adequate inquiry and failed to secure a valid waiver." (*Id.* at 58.) He requests an evidentiary hearing to determine whether he was fully informed of the conflict and of his right to conflict-free representation.

Petitioner has also submitted evidence that his attorney was the subject of several disciplinary actions by the California State Bar and was subject to court-ordered disciplinary probation at the time of petitioner's trial. (Traverse, Exs.A—E.) Petitioner claims that counsel's actions at trial— specifically, his failure to obtain petitioner's informed written consent to represent him while he was concurrently representing Detective Gamberg, violated counsel's probation and should have resulted in his disbarment. (Traverse at 30.) Petitioner argues that all of the factors described above, in combination, violated his right to "conflict-free and effective representation, to a fair trial and due process." (Am. Pet. at 60.)

Respondents, on the other hand, argue that petitioner was completely informed of his attorney's involvement in Detective Gamberg's civil lawsuit, that he knowingly waived his right to conflict-free representation and that, in any event, there was no conflict of interest under these facts. Respondents have filed the affidavit of petitioner's trial counsel, Mr. Jackson, which provides in pertinent part:

2. I notified Petitioner that I had filed a civil action for Detective Michael Gamberg against the Plumas County District Attorney.

3. Petitioner assured me that he wanted me to be appointed to represent him.

4. I told Petitioner he would need to relate that to the judge who appointed me.

5. At the preliminary hearing on March 13, 1992, I disclosed the civil representation to the court, Mr. Gamberg, and Mr. Richardson on the record.

6. I believed then and I believe now that Mr. Richardson understood the situation, resolved the issues in his mind, and wanted me to continue. . . .

7. I had no personal interest in Mr. Gamberg's case that affected me in his case. It was not pursued because Mr. Gamberg decided on his own not to pursue it.

8. Mr. Richardson's case was handled to the best of my ability. Case tactics were directed by the client's need to keep his innocent co-defendant from becoming circumstantially responsible for what he did alone.

(Answer, Ex. 20.)

 The Sixth Amendment right to counsel includes the right to counsel of undivided loyalty. *Wood v. Georgia,* 450 U.S. 261, 271–72, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). "In order to demonstrate a violation of his Sixth Amendment rights on the basis of an alleged conflict, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sulli-*

*van,* 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). *See also Bonin v. Calderon,* 59 F.3d 815, 825 (9th Cir.1995). An adverse effect in the *Cuyler* sense must be one that "significantly worsens counsel's representation of the client before the court or in negotiations with the government." *United States v. Mett,* 65 F.3d 1531, 1535 (9th Cir.1995). Although a defendant alleging a conflict of interest "need not demonstrate prejudice," he must prove that "counsel actively represented conflicting interests." *Cuyler,* 446 U.S. at 349, 100 S.Ct. 1708. The rule prohibiting an attorney from representing conflicting interests serves to protect confidential information obtained during the course of an earlier representation, ensure undivided attorney loyalty and guard against infringement of the right to cross-examination. *See Sanders v. Ratelle,* 21 F.3d 1446, 1452–53 (9th Cir.1994); *Fitzpatrick v. McCormick,* 869 F.2d 1247, 1252 (9th Cir. 1989); *United States v. Allen,* 831 F.2d 1487, 1496–97 (9th Cir.1987); *Trone v. Smith,* 621 F.2d 994, 999 (9th Cir.1980). Courts "generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client." *Burger v. Kemp,* 483 U.S. 776, 784, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).[29]

 To protect a defendant's right to conflict-free counsel, a trial court must initiate an inquiry when it knows or reasonably should know of the possibility of a conflict of interest. *Wood,* 450 U.S. at 272, 101 S.Ct. 1097. *See also Wheat v. United States,* 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *Cuyler,* 446 U.S. at 347, 100 S.Ct. 1708. After inquiry, the court is required to act in response to what its inquiry discovers. *See Holloway,* 435 U.S. at 484, 98 S.Ct. 1173. In fulfilling its obligation, the court may make arrangements for representation by conflict-free counsel or take no action at all if it determines that the risk of a conflict is too remote. "A defendant may waive his right to the assistance of an attorney unhindered by a conflict of interests." *Holloway,* 435 U.S. at 483 n. 5, 98 S.Ct. 1173. *See also Lockhart v. Terhune,* 250 F.3d 1223, 1229 (9th Cir.2001). Any such waiver must be given "knowingly and intelligently." *Id.* Whether there is a proper waiver should be determined by the trial court and any such waiver should appear on the record. *Johnson v. Zerbst,* 304 U.S. 458, 464–65, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). In addition, whether a defendant has made a valid waiver of his Sixth Amendment rights depends "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id.* at 464, 58 S.Ct. 1019. *See also Edwards*

---

**29.** Conflicts of interest broadly embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests. (*See* generally ABA, Model Rules Prof. Conduct (1983) rule 1.7 and com. thereto.) Conflicts may occur in various factual settings. For example, conflicts may arise in circumstances in which one attorney represents more than one defendant in the same proceeding. *See, e.g., Holloway v. Arkansas,* 435 U.S. 475, 481–91, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). Conflicts may also arise in situations in which an attorney represents a defendant in a criminal matter and currently has, or formerly had, an attorney-client relationship with a person who is a witness in that criminal matter. *See, e.g., Leversen v. Superior Court,* 34 Cal.3d 530, 536–540, 194 Cal.Rptr. 448, 668 P.2d 755 (1983); *Thomas v. Municipal Court,* 878 F.2d 285, 288–90 (9th Cir.1989). Under California law, an attorney has a duty to withdraw, or apply to a court for permission to withdraw, from representation that violates his duty to provide effective assistance to the criminal defendant facing trial and his fiduciary obligations to the witness with whom he has or had a professional relationship. *Leversen,* 34 Cal.3d at 538, 194 Cal.Rptr. 448, 668 P.2d 755.

*v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

■ In this case, the California Superior Court concluded that petitioner waived his right to conflict-free counsel. (Answer, Ex. 13 at 1.) The court stated: "[t]he records indicates [sic] that there was a complete disclosure in open court at the preliminary hearing, and that there was an informed waiver. (*Id.*) This court agrees. As described above, petitioner was questioned twice on the record about his counsel's representation of Detective Gamberg and both times stated that he wished to continue with attorney Jackson as his counsel. Petitioner was informed that his counsel was representing Detective Gamberg in a civil action. He was asked whether he wished to continue to have Mr. Jackson represent him with the obvious alternative being that petitioner could elect to proceed with alternate counsel. During the second colloquy on this subject, petitioner's counsel highlighted the fact that his representation of Detective Gamberg might raise a question about the quality of his cross-examination of Gamberg. Further, in his affidavit, petitioner's trial counsel states that he and petitioner discussed counsel's representation of Gamberg prior to the preliminary hearing, that petitioner understood the situation, resolved the issues posed thereby in his mind and wanted counsel to continue to represent him in the criminal proceeding despite his representation of Gamberg in the civil action. (Answer, Ex. 20.) Again, with these disclosures in mind, petitioner informed the trial court that he wanted to proceed with attorney Jackson as his counsel. Although petitioner's current attorneys in this federal habeas action argue that petitioner's trial counsel did not discuss the conflict of

representation with petitioner prior to the preliminary hearing or make a "meaningful" attempt to explain the ramifications of the conflict to him (traverse at 29), petitioner has not, for instance, filed his own affidavit in support of that allegation. Under the circumstances presented here, the California Superior Court's conclusion that petitioner made a valid waiver of his right to conflict-free counsel is not contrary to or an unreasonable application of federal law and should not be set aside.[30]

■ Petitioner requests an evidentiary hearing to determine what he was told about the conflict by his counsel prior to his waiver. Pursuant to 28 U.S.C. § 2254(e)(2):

> (e)(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.

Under § 2254(e)(2), an applicant's failure to develop the factual basis of a claim is not established unless there is a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's coun-

---

**30.** Petitioner questions the ethics of his trial counsel in failing to obtain petitioner's written waiver of a conflict of interest, suggesting that his attorney should have been disbarred

for his conduct in this regard. However, enforcement of ethical standards is the primary concern of the state courts and of state associations of lawyers and judges.

sel." *Williams v. Taylor,* 529 U.S. 420, 432, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). Diligence "will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." (*Id.* at 437, 120 S.Ct. 1479.)

Here, petitioner filed a petition for writ of habeas corpus with the Plumas County Superior Court, which included a claim that his attorney had a conflict of interest because of his representation of Detective Gamberg in the civil case. Petitioner did not request an evidentiary hearing in that petition. (Answer, Vol.III, Ex. 12.)[31] Subsequently, petitioner filed petitions for writ of habeas corpus with the California Court of Appeal and the California Supreme Court. Petitioner similarly failed to request an evidentiary hearing in those forums. (Pet'r Pet. for Writ of Habeas Corpus, filed by respondents on October 25, 2001; Answer, Vol. III, Ex. 15.) Petitioner's inaction shows insufficient diligence to satisfy the standard set forth in *Williams. See Bragg v. Galaza,* 242 F.3d 1082 (9th Cir.2001), *amended by* 253 F.3d 1150 (2001) (evidentiary hearing precluded by AEDPA because petitioner failed to diligently pursue his claims in state court).

Petitioner's failure to develop this claim requires him to satisfy the standards set forth in § 2254(e)(2) in order to obtain an evidentiary hearing on the issue in this federal habeas proceeding. He is unable to do so. Petitioner cannot show that this claim is based on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or a factual predicate that could not have been previously discovered through the exercise of due diligence. In addition, petitioner has failed to establish that the facts underlying this claim would be sufficient to establish by clear and convincing evidence that but for the alleged constitutional error, no reasonable fact finder would have found him guilty of the underlying offense. Accordingly, petitioner is not entitled to an evidentiary hearing on this claim.

### VII. *Cumulative Error*

Finally, petitioner contends that errors at his trial, when considered cumulatively, deprived him of a fair trial. The Due Process Clause of the Fourteenth Amendment encompasses the right to a fair trial. *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). However, as the United States Supreme Court has stated:

> The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed. As we have repeatedly stated, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one."

*Rose v. Clark,* 478 U.S. 570, 579, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

This court has addressed each of the issues raised in the pending petition and has found merit with respect to two of petitioner's claims. With respect to the other claims of error, the court concludes that they did not render petitioner's trial fundamentally unfair, either individually or in their cumulative effect.[32] Accordingly,

---

**31.** The Superior Court concluded that "there was a complete disclosure in open court at the preliminary hearing, and that there was an informed waiver." (Answer, Ex. 13 at 1.)

**32.** Although the United States Supreme Court has not articulated a claim of "cumulative error," the Ninth Circuit has stated that where "no single trial error examined in iso-

any decision by the California courts rejecting petitioner's cumulative error claim is not contrary to or an unreasonable application of federal law.

## CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be granted on his claim that the Confrontation Clause was violated by the admission into evidence, at the joint trial, of Michelle Garduno's extrajudicial statements and in the denial of his motion for a severance, and denied in all other respects.

These findings and recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst,* 951 F.2d 1153 (9th Cir.1991).

Dated Sept. ——, 2004.

lation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United* States v. Frederick, 78 F.3d 1370, 1381 (9th Cir.1996). *See also Karis v. Calderon,* 283 F.3d 1117, 1132 (9th Cir.2002) (same).